732 So.2d 800 (1999)
STATE of Louisiana, Appellee,
v.
Tyrone PICKROM, Appellant.
No. 31,987-KA.
Court of Appeal of Louisiana, Second Circuit.
May 5, 1999.
*802 Harvetta S. Colvin, Stephen A. Glassell, Shreveport, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, B. Woodrow Nesbitt, Jr., Assistant District Attorney, Counsel for Appellee.
Before NORRIS, BROWN and DREW, JJ.
DREW, J.
Tried before a jury for second degree murder (La. R.S. 14:30.1), Tyrone Pickrom, was convicted of the responsive charge of manslaughter, a violation of La. R.S. 14:31. Subsequently adjudicated an habitual offender, defendant was sentenced to serve 30 years at hard labor. In this appeal, defendant asserted 10 assignments of error which we have determined *803 to be without merit. Both his conviction and sentence are affirmed.[1]

FACTS
On November 4, 1995, shortly after 11:00 p.m., Myron Smith, Gary Griffin, Chance Lewis, and the defendant left a party at the "Bronx," an apartment complex located off North Market Street in Shreveport. Smith, Griffin, Lewis and the defendant, all self-proclaimed members of the Blood gang, proceeded back to the defendant's home at 1206 Crestmoor in the Cherokee Park neighborhood. With the defendant driving, they passed the residence at 418 Braebrook ("418") where members of a rival gang, the Crips (sometimes referred to herein as the "Rollin' 60s"), were in the front yard.
Initially, the defendant and the others simply drove past 418. For reasons in dispute at the trial, they stopped on Braebrook and began to back up toward 418, where a blue Cadillac was parked. Shots were fired from the front yard of 418 at the car that defendant was driving, shattering the rear window, but missing the vehicle's occupants. Smith jumped out of the car. After the shots were fired, the defendant hit the accelerator. The defendant, Lewis and Griffin went back to the defendant's house. The Crips who had been in front of 418 Braebrook left shortly thereafter in the blue car.
418 Braebrook was the home of the Johnson family. Inside the Johnson residence were a group of children, ranging in age from 8 to 16 years: Dajah "Red" Johnson, Tatenessia "Punkin" Johnson, Ricquita "Nuke" Johnson, Tchaikovsky "Tweety Bird" Johnson, Joseph "Little Joe" Livingstone, Degetrion "D" Scott, and the victim, Andre "Dre" Brooks, who was 14 years old. Red, Punkin, Nuke, and Tweety Bird were siblings. Little Joe, D, and Dre were close friends of Tweety Bird.
When the defendant, Griffin and Lewis arrived at the defendant's Crestmoor residence, they told the owner of the car, Kenny West, that the back window had been shot out of his car. West and Lewis both testified that Lewis then began walking alone to his home located at 410 Braebrook. Lewis further testified that after leaving the defendant's house, he never saw the defendant or Smith again on the night of November 4, 1995.
In addition to West, defendant's older brother, Henry Pickrom; Henry's girlfriend, Devonda Grundy; defendant's sister, Yolanda Pickrom; and her friend, La-Chandra "China Doll" Johnson, sister of the Johnson children who lived at 418, were at defendant's residence. Upon entering his residence, defendant retrieved a 7.62 mm assault rifle, referred to during the trial as an AK or an SKS, loaded via a banana clip containing bullets that were, according to firearm expert Richard Beighley, unique Russian military "target" ammunition never before seen in Shreveport. The defendant's testimony makes clear that he, Smith, Lewis and Griffin were furious at those who had, only moments before, shot at the car and blown out the back window. It was also confirmed by all who were present, including the defendant himself, that he left the Pickrom residence on foot around 11:00 p.m. with the loaded gun and headed down Crestmoor to Braebrook, in the direction of 418. State and defense testimony conflicted as to whether Smith was with the defendant and Griffin at the defendant's residence when the defendant retrieved the gun.
Undisputed is that shortly after 11:00 p.m., the neighborhood was rocked with loud gunshots, and that several minutes after the gunshots ceased, the defendant, Smith and Griffin all arrived at the defendant's residence on Crestmoor. West, Griffin and the defendant all testified that *804 Smith returned holding the gun. West and Yolanda Pickrom testified that after the shooting, the defendant went into Yolanda's room with the gun and placed it under her mattress in a drawer that pulled out, where it remained for a brief time. Griffin, Smith and the defendant then left the defendant's residence and went to the home of Carl Chambers who was Smith's good friend.
Chambers testified that he let the defendant, Smith and Griffin into his house where Smith asked to use the phone. When Chambers went back into the room while Smith was on the phone, Chambers testified he heard Smith ask his girlfriend to call someone she knew at the local 911 service and to find out what had happened at 418. After Smith ended his phone call, Chambers testified that he drove Smith, Griffin and the defendant out of the neighborhood to other locations. Although their destinations were unclear, Griffin and the defendant together exited Chambers' vehicle first and Chambers continued on with Smith.
Immediately prior to the shooting at 418, most of the children in the house were in the front room watching movies. The children's testimony is that D looked outside on two occasions, turned around and yelled "They're going to shoot." Everyone went to the floor. On the first occasion, he was joking but on the second, he was serious. Several of the children testified about the bullets coming from every angle, about their efforts to seek cover, about screaming, and about the older kids, D and Tweety Bird, pushing them down on the floor and covering their bodies so that the bullets would not hit them. They also testified about getting up from the floor after the shooting ended and seeing Andre Brooks lying on the floor with blood all around him, convulsing, choking and gagging. They got a little towel to stop the bleeding and called the police department.
Andre Brooks died at the scene. When his body was delivered to the morgue for an autopsy, a bullet fell from his hood that was later determined to have been fired from a 7.62 mm assault rifle and to be a unique type of Russian military target ammunition. The police found sixteen bullet hulls at 418. Another was discovered in the yard of Donald Mims who lived next door. The foregoing, as well as the bullet that fell out of Andre Brooks' hood, matched the test bullets that firearm expert Beighley fired from the defendant's gun after it was recovered by the police.
To try to see who was shooting and where, Mims testified that he went outside his home at what he thought was the end of the shooting but what was actually a short break. When the shooting began again, Mims hit the ground in his carport and stayed there until it stopped again. Then, he got up, peered around the corner of his carport and saw two men walking up Braebrook toward Crestmoor. However, Mims was not able to identify the men.
Approximately 10 days later, the defendant turned himself in at the police station and was arrested and charged with first degree murder. In the interim, the defendant's gun and bullet clip were recovered from the storage room at the defendant's Crestmoor residence. Steve Flakes, defendant's next door neighbor, testified that Smith phoned him and advised him that the gun and clip were in Flakes' storage room. Flakes found them and placed the items in the storage room at defendant's residence. Flakes also testified that, before defendant's arrest, defendant called him and told Flakes that someone would come to Flakes' house and retrieve the gun and clip. Flakes stated at trial that during this call the defendant told him "I think I killed someone." At trial, the defendant denied ever calling Flakes.
The defendant never made a statement to the police. However, Griffin made several conflicting statements to the police. He gave two contradictory statements upon his arrest, another version at the grand jury proceedings and yet another story, which he swore was "the truth," at *805 this trial when called during the defendant's case-in-chief.
In April 1997, defendant was tried for second degree murder. During the seven-day trial, there was much conflicting testimony from both prosecution and defense witnesses. After the state rested, the defense called Griffin and the defendant. Both gave the following account of the events of November 4, 1995: After they returned in the car to the Pickrom residence, Lewis decided that he wanted to return to his house at 410 Braebrook and asked the defendant to walk him there. Because they had just been fired upon, the defendant testified that he got the gun to protect himself and Lewis on the walk. Defendant admitted he left his house carrying the weapon. Upon arriving at Lewis's home, defendant, Smith (who allegedly joined them at the corner of Braebrook and Crestmoor), Lewis and Griffin stood in the driveway and smoked cigarettes until they heard Ms. Lewis coming to the door. Because Lewis was on juvenile probation and not supposed to be around the defendant, both the defendant and Griffin testified that defendant handed the gun to Smith and told him to hide it from Lewis's mother. The defendant testified he tried to hide from Ms. Lewis in the bushes.
The defendant and Griffin testified that Smith took the gun and began walking with it in the direction of 418. The defendant said he first thought nothing of it, but when he realized that Smith intended to shoot, he called out to him, "What's up, What are you fixing to do?" Defendant declared he ran away from Smith's location and went behind Lewis's house to a set of trails that eventually led defendant out to Mayfair Street. From there, defendant went back to his house on Crestmoor.
Griffin's testimony corroborated that of defendant up to the point when the shooting began. Griffin's account was that after the defendant called out to Smith, the defendant moved toward Smith and the shooting began. Griffin admitted that he was not sure if the defendant eventually got the gun from Smith and shot at 418 as well. Both agreed that they all returned to defendant's house (after the 418 shooting) where Griffin told Smith to "get rid of the gun." Griffin stated Smith went somewhere with the gun which Griffin did not see and Smith returned without the gun. Griffin testified that the defendant never went back into the house but stayed with him in the yard until they went to Chambers' home. The defendant testified that he went back into his house several times after the shooting. They both agreed that they left the neighborhood with Chambers who dropped them both off together at the home of Griffin's girlfriend.
After the testimony of Griffin and the defendant, the state presented one rebuttal witness, Officer Rambin. The state then rested its case on the evening of Friday, April 4, 1997. During the intervening weekend, the prosecutor informed the defense counsel and the court that the state intended to make an oral motion to reopen the state's case on Monday morning for further rebuttal. The court allowed the state to reopen rebuttal over strenuous objection from defense counsel. The state presented the testimony of several witnesses, including the defendant's mother, Mary Thornton; Lewis; Lewis's sister, Katina Lewis Smith and their mother, Bobbie Lewis. The defendant called Deputy James Caldwell during the reopened rebuttal.
Both Katina Lewis Smith and Bobbie Lewis testified that Mary Thornton called their home on April 5, 1997, (the Saturday after the state rested its rebuttal case on Friday evening) to inquire if they had been contacted by the prosecution about Chance Lewis testifying. Bobbie Lewis and Katina Lewis Smith testified that it was a three-way call involving defendant from the jail. During the phone conversation, defendant stated "I walked Chance home" several times which meant nothing to either Bobbie Lewis or Katina Lewis Smith. Bobbie Lewis allowed police officers to come to her home that day where they *806 photographed her caller identification box showing the name and phone number of Mary Thornton. They also photographed the outside area where the defendant claimed that he hid in the bushes. The state introduced these photographs during rebuttal.
In his testimony, Lewis flatly denied that he ever asked the defendant to walk him home on the night of the shooting. Lewis testified that he jumped out of the car as soon as it arrived at the Pickrom residence. He shouted to West that his window had been shot out and headed home alone. He testified that when he arrived at his house, Griffin was already under the carport. Lewis opined that Griffin must have come to his house on the series of trails that ran behind homes in this neighborhood. Griffin and Lewis talked until the shooting began, when Lewis's mom came to the carport door and told him to come inside. He went in and Griffin left. Lewis testified that he stayed in his house until the shooting ended and the police arrived at 418.
This defendant was found guilty of manslaughter, a responsive verdict. After being adjudged an habitual offender, based on this second felony conviction, the defendant was sentenced to 30 years at hard labor. After unsuccessfully moving for a post-judgment motion for acquittal, as well as a motion for new trial and a motion to reduce his sentence, defendant filed the instant appeal.

DISCUSSION
Assignment of Error # 2: The trial court erred in refusing to allow the admission of evidence that should have been admitted.
Defendant has not briefed this assignment of error. Assignments of error which are neither briefed nor argued are considered abandoned. URCA Rule 2-12.4; State v. Kotwitz, 549 So.2d 351 (La. App. 2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990).
Assignment of Error # 9: The trial court erred in denying the defendant's motion for a post-verdict motion of acquittal.
This assignment challenges the sufficiency of the evidence in this matter. The criterion for evaluating sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational fact-trier could find that the state proved all elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Clower, 30,745 (La.App. 2d Cir.6/24/98), 715 So.2d 101. That standard, initially enunciated in Jackson and now legislatively embodied within La.C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Clower, supra. When the defendant challenges both the sufficiency of the evidence and one or more trial errors, the reviewing court will first review the sufficiency, as a failure to satisfy Jackson will moot the trial errors. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bullard, 29,662 (La.App. 2d Cir.09/24/97), 700 So.2d 1051.
It is the function of the jury to assess the credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993). Where a trier of fact has made a rational determination, an appellate court should not disturb it. Absent internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion. State v. Clower, supra; State v. Thomas, supra.
Citing State v. Douglas, 30,393 (La. App. 2d Cir.02/25/98), 707 So.2d 512, the defendant contends a conviction based upon circumstantial evidence can be affirmed only if the reasonable hypothesis is one favorable to the state and there is no extant reasonable hypothesis of innocence. In defendant's view, there exists a reasonable *807 hypothesis of innocence; i.e., defendant's and Griffin's assertions that the defendant got the gun for protection to walk Lewis home and then passed the gun off to Smith who took it, shot at 418, killed Andre Brooks, returned with it and disposed of it. According to the defense, defendant was an innocent bystander who had the misfortune to give the gun to a murderer. The jury reasonably rejected that hypothesis. Having reviewed the evidence in the light most favorable to the prosecution, we have determined that the jury could rationally have found the defendant guilty beyond a reasonable doubt.
The facts adduced at trial show that the defendant was the driver of the car at which persons in the front yard of 418 shot, breaking out the rear window. It is undisputed that the defendant then went into his house, retrieved a gun with a clip of bullets and left his house with the weapon, walking back towards Braebrook. Notwithstanding defendant's and Griffin's testimony that they walked Lewis home, the jury chose to believe Lewis who said that he walked home alone and never saw the defendant again that night.
A short time after shots shattered the car window, gunfire into 418 killed Andre Brooks. It is undisputed that 16 bullet hulls recovered from the scene at 418 and a bullet from the clothing of the victim matched the gun that the defendant took from his house. In contrast to defendant's and Griffin's testimony that Smith returned to the house with the gun and then disposed of it, many witnesses, including Yolanda Pickrom and West, testified that they saw the defendant with the gun and that the defendant initially hid the weapon in Yolanda's bedroom.
Although the defendant testified he ran in a direction away from Smith and 418, Griffin testified that the defendant move toward Smith and 418. Bobbie Lewis and Katina Lewis Smith testified that they were contacted by the defendant and his mother, Mary Thornton, via a three-way call in which defendant stated he "walked Chance home." Bobbie Lewis testified and the pictures showed that the defendant would have been unable to hide from her that night in the bushes. Defendant left the neighborhood on the night of the shooting. There is adequate evidence to sustain the responsive verdict of manslaughter. This assignment is without error.
Assignment of Error # 5: The trial court erred in allowing improper and prejudicial argument in the presence of the jury.
Assignment of Error # 7: The trial court erred in denying the defendant's motion(s) for mistrial.
The defendant contends that the trial court erred in denying his motions for mistrial during the testimony of Detective Rambin, Demetrus Brooks and the defendant. La.C.Cr.P. arts. 770, 771 and 775 provide in pertinent part:
Art. 775. Grounds for Mistrial
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
Art. 770. Prejudicial remarks; basis of mistrial
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
. . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;...
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall *808 admonish the jury to disregard the remark or comment but shall not declare a mistrial.
Art. 771. Admonition
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the minds of the jury:
(1) When the remark or comment is made by the judge, the district attorney or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A mistrial is a drastic remedy which should be declared only when unnecessary prejudice results to the accused. State v. Smith, 430 So.2d 31 (La.1983); State v. Harris, 28,517 (La.App.2d Cir.8/21/96), 679 So.2d 549, writ denied, 96-2954 (La.9/26/97), 701 So.2d 975. The trial court has the discretion to determine whether a fair trial is impossible or whether an admonition is adequate to assure a fair trial when the alleged misconduct does not fit into the provisions for a mandatory mistrial, and the ruling will not be disturbed upon review absent an abuse of discretion. State v. Narcisse, 426 So.2d 118 (La.1983), cert denied; State v. Stephenson, 412 So.2d 553 (La.1982); State v. Sneed, 571 So.2d 735 (La.App. 2d Cir. 1990).

Detective Rambin's Testimony:
When Detective Rambin testified during the state's case in chief, the defense moved for a mistrial on recross-examination in response to a question asked by defense counsel. The pertinent testimony is as follows:
Q. The evidence that you have on Tyrone Pickrom is this. One, 
Mr. Nesbitt (ADA): I will object in advance. I believe that's jury function to determine what evidence has been proven as to Tyrone Pickrom.
Mr. Glassell: I can ask him a leading question because he is on cross but let me rephrase it.
Mr. Nesbitt: It's an irrelevant question. It's a jury function. To ask the detective to summarize for the jury the evidence the lawyer asked the detective if they had, that's what the jury is for.
Mr. Glassell: Let me ask it this way.
The Court: Ask your question. And wait before you answer.
Q. (by Mr. Glassell) Kenny West testified at this trial and China Doll Johnson testified at this trial that they saw Tyrone Pickrom take this gun and leave the residence at 1206 Crestmoor prior to the shooting. Now that's the evidence that you uncovered through your investigation, isn't it?
A. Yes, sir.
Q. Did you uncover any evidence that would put Tyrone Pickrom in front of the house that was shot? Eyewitnesses? Any eyewitnesses that put Tyrone Pickrom in front of the house?
A. Myron Smith's statement.
Following this statement, the defense counsel asked to have the jury removed. At that point, the defense did not make a motion for mistrial. Jury instructions were discussed and a lunch recess was taken. After the lunch recess, the defense made its motion for mistrial.
Mr. Glassell: Your Honor, we would like to ask for a mistrial based on the *809 statement given by Officer Rambin referring to Myron Smith. Any statements that Myron Smith would have made are inadmissible at this trial and the detective in his response. I think it could be inferred that he was telling them that Myron Smith had told him that Tyrone was involved in the shooting. I might have to ask the court reporter to read us the last question and answer.
(Court reporter reads last question and answer)
Mr. Glassell: Myron Smith's statement which is inadmissible in this trial.
Denying the motion for a mistrial, the trial court ruled that the defense counsel's question to the witness called for a truthful answer, which the detective gave. Defense counsel did not request that an admonition be given.
Thereafter, on redirect examination, the prosecutor asked Detective Rambin:
Q. To be sure that I heard your response because you were pretty quiet about it. Mr. Glassell asked you if you had any eyewitnesses who reported to you that Mr. Pickrom was at the scene of the murder at the time it occurred.
A. Yes, sir.
Q. And your answer was?
A. Myron Smith's statement.
Following this exchange, Detective Rambin was excused and no motion for mistrial was made by defense counsel. Nearly two and one-half hours later, the defense made a second motion for mistrial based on Detective Rambin's testimony and the inability of the defendant to confront Smith.
A contemporaneous objection is necessary to preserve the issue for appellate review. La.C.Cr.P. art. 841. An objection made after the evidence is before the jury comes too late. State v. Bretz, 394 So.2d 245 (La.1981), cert. denied; State v. Thompson, 569 So.2d 593 (La.App. 2d Cir.1990), writ denied, 592 So.2d 1314 (La.1992). The evidence was already before the jury and the witness who made the statement had been excused. No objection was made and no admonition was requested. The issue was not properly preserved for appellate review.
A police officer is not a court official under mandatory mistrial provisions of La.C.Cr.P. art. 770. Thus a mistrial is not required absent a showing of a pattern of unresponsive answers or improper intent by the police officer. The proper remedy for an inappropriate remark by a law enforcement official is an admonishment directing the jury to disregard that remark. La.C.Cr.P. art. 771; State v. Watson, 449 So.2d 1321 (La.1984), cert denied; State v. Coutee, 545 So.2d 571 (La.App. 2d Cir. 1989), writ denied, 551 So.2d 1335 (La. 1989).
Furthermore, the state is not responsible for responsive testimony elicited by defense counsel. The defendant cannot claim reversible error on the basis of testimony that he elicited. State v. Billiot, 521 So.2d 763 (La.App. 2d Cir. 1988). Officer Rambin answered a question posed by defense counsel.
Finally, the defendant complains that Officer Rambin's response infringes upon his right to confront the witness, Myron Smith, which error was compounded by the prosecutor's asking the question a second time and referring to the answer during closing. Cross-examination is the principal means by which the believability of the witness and the truth of his testimony are tested. State v. Kimble, 27,960 (La.App. 2d Cir.05/08/96), 688 So.2d 552. There are several factors available to the reviewing court to determine whether the error was harmless beyond a reasonable doubt: the importance of the witness' testimony in the prosecution's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; and the overall strength *810 of the prosecution's case. State v. Kimble, supra.
Myron Smith did not testify at this trial and his statement was not read into evidence. Officer Rambin's testimony in this area was directly responsive to the question posed and was limited to "Myron Smith's statement." On the other hand, there was much testimony that implicated the defendant without the statement of Smith being introduced. A defense witness, Griffin, placed the defendant in the vicinity of 418 as Smith began to fire the shots. Without objection, Flakes testified that the defendant called and told him, "I think that I may have killed somebody." Many witnesses, including the defendant, testified the defendant picked up the gun and left his house carrying it on the night of the shooting. Chance Lewis contradicted the defendant's and Griffin's testimony that the gun was for protection while walking Lewis home; Chance Lewis denied asking anyone to walk him home that night, and further denied that anyone did walk him home. Chance Lewis's mother and sister (Bobbie Lewis and Katina Lewis Smith) took a call from the defendant and his mother (Mary Thornton) in which defendant apparently attempted to convey the "walking home" lie to Lewis for rebuttal testimony. This error is without merit.

Testimony of Demetrus Brooks:
Defendant next argues that the trial court failed to grant a mistrial after Demetrus Brooks gave the following testimony:
Q. You had the occasion to talk with Yolanda?
A. Yes.
Q. What, if anything, do you recall Yolanda said about her brother and a gun if anything?
The Court: Don't answer right now.
Mr. Glassell: Your Honor, we would make the same objection we made to the last witness' testimony, this is hearsay testimony.
Mr. Nesbitt: Same ruling?
The Court: This isapproach the bench please.
(Off-the-record discussion)
The Court: You can proceed.
Q. (By Mr. Nesbitt) Do you know LaBaron Johnson?
A. Yes.
Q. Was he with you at the time?
A. Yes.
The Court: Overruled. Your objection is noted for the record.
Mr. Glassell: We would like our objection noted and make this a continuing objection to any statements made by Yolanda Pickrom.
The Court: So noted.
Q. (By Mr. Nesbitt) Tell usI know it's very brief. Tell us about that conversation with Yolanda at that time.
A. Okay. The day after the shooting, it was on a Sunday around 1:00, Yolanda told me this, she said, I know my brother shot Andre because he gave me the gun to hide.
Defendant objected, asked that the jury be removed and then moved for a mistrial which was argued and overruled. Defense counsel requested an admonition. The trial court instructed the jury to totally disregard the statement given by Demetrus Brooks and that the statement proved nothing.
The trial court did not err in refusing a mistrial under these circumstances. La. C.Cr.P. art. 771 allows a mistrial in such circumstances, but at the discretion of the trial court and when such an admonition will not serve to cure what is found to be substantial prejudice. State v. Michel, 422 So.2d 1115 (La.1982); State v. Loyd, 455 So.2d 687 (La.App. 2d Cir.1984), writ denied, 461 So.2d 313 (La.1984). There is no substantial prejudice in denying the mistrial and instead giving the strong admonition as was done in this case, resulting in no abuse of discretion by the court. There is no merit in this assignment.

*811 Testimony of Defendant:

On direct examination, the defendant stated:
A. Well, I really basically wasn't looking for no blue Cadillac, you know. I wasn't looking for no trouble really. Only thing, I got the gun to walk Chance home. I wasn't really thinking if anything was going to happen when I left walking. If I did, I wouldn't have went around there because I was already on probation and I wanted to avoid trouble.
Q. What were you on probation for?
A. Well, I was on probation for accessory after the fact of the armed robbery since '93.
Q. You pled guilty to that offense?
A. Yes, I did.
Q. You were on probation?
A. Yes, I was.
Q. Were you doing okay on probation?
A. Yes.
On cross-examination, the prosecutor questioned the defendant extensively about his criminal history while on probation. The defendant admitted that while on probation, he was arrested for possession of marijuana, as well as for possession of a firearm by a convicted felon and possession of an altered firearm by a convicted felon (an obliterated serial number). Defense counsel did not object at the time of cross-examination on the Friday evening of trial. On Monday morning, the defense based its motion for mistrial on other crimes evidence. This motion for mistrial was not timely. The evidence had already been before the jury for two days and the trial court did not have the opportunity to cure any defect that this testimony may have caused. This issue was not properly preserved for appeal.
While evidence of other crimes could be grounds for a mistrial pursuant to La. C.Cr.P. art. 770, the defendant's own counsel questioned defendant about other crimes and his probationary status. The defendant's testimony on direct that he was doing "okay on probation," opened the door for cross-examination about his probationary status. The trial court did not commit reversible error in allowing the state to briefly question this defendant about his pending probation violations. State v. Cotten, 438 So.2d 1156 (La.App. 1st Cir.1983), writ denied, 444 So.2d 606 (La.1984); State v. Richard, 550 So.2d 300 (La.App. 2d Cir.1989). This assignment of error is without merit.
Assignment of Error # 1: The trial court erred in allowing the admission of certain evidence which should have been excluded.
Assignment of Error # 3: The trial court erred in allowing the state to improperly present evidence during rebuttal.
Assignment of Error # 4: The trial court erred in allowing the state to reopen the state's case and, in effect, to retry the state's case in chief after the defendant's case in chief.
Assignment of Error # 8: The trial court erred in denying the defendant's motion for a new trial.
Grouped by the defendant in brief and argument, these assignments involve the trial court's decision to permit the state to present additional rebuttal on Monday, April 7, 1997, before closing arguments, despite the fact that the state rested after one rebuttal witness the preceding Friday evening.
La.C.Cr.P. art. 765 provides:
The normal order of trial shall be as follows:
1. The selection and swearing of the jury;
2. The reading of the indictment;
3. The reading of the defendant's plea on arraignment;
4. The opening statements of the state and of the defendant;

*812 5. The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument;
6. The argument of the state, the defendant and the state in rebuttal;
7. The court's charge;
8. The announcement of the verdict or mistrial in jury cases, or of the judgment in nonjury cases; and
9. The discharge of the jury in jury cases.
Where there is more than one defendant, the court shall determine the order of trial as between them.
A defendant may waive his opening statement.
Generally speaking, the court has considerable latitude in determining whether a party to a criminal case is allowed to reopen after resting. La.C.Cr.P. art. 765(5); State v. Bonanno, 373 So.2d 1284 (La.1979). There is no legal prohibition against the state reopening its case to submit additional evidence as long as it does so before closing arguments. The trial court's decision in this regard is not disturbed where it does not prejudice the defendant. State v. Bonanno, supra.

Impeachment of Yolanda Pickrom:
The prosecution did not call Yolanda Pickrom, sister of the defendant, as a witness until rebuttal was reopened. To rebut defendant's testimony that he never touched the gun again after he gave the weapon to Smith to hide from Chance Lewis's mom immediately prior to the shootings, the state questioned Yolanda Pickrom about defendant's hiding the gun in her room after the shooting. Yolanda Pickrom gave contradictory and evasive answers to questions about the type and size of the gun and where it was hidden in her room.
In relation to the introduction of extrinsic evidence, La. C.E. art. 613 requires that a distinct foundation be laid before a prior inconsistent statement is admissible to impeach the witness. The witness's attention must be fairly directed to the particular statement and she must be given the opportunity to admit the "fact" of her prior inconsistent statement. If the witness fails to distinctly admit her prior inconsistent statement, the extrinsic evidence of the prior inconsistent statement is admissible. State v. Taylor, 593 So.2d 431 (La.App. 2d Cir.1992).
Yolanda Pickrom responded affirmatively to the prosecutor's inquiry whether she recalled talking to LaBaron Johnson, Demetrus Brooks and Detective D.A. Lott. She testified that she told each of them that her brother came back to the house with a gun and hid it in her room. She denied saying what kind of gun it was. The state then called each of these witnesses to impeach her responses to those specific questions. While Demetrus Brooks provided additional non-responsive prejudicial testimony, the jury was properly admonished to disregard it.

Impeachment of Kenneth West:
Kenneth West testified at Myron Smith's trial that this defendant (Tyrone Pickrom) returned to the Pickrom residence holding the gun. In order to impeach West's earlier testimony in this trial that Smith returned to the defendant's house holding the gun, the prosecutor recalled Kenneth West. It is within the discretion of the court to allow the state to recall a witness on rebuttal. Furthermore, no error is committed if defense counsel is allowed to cross-examine the witness concerning this rebuttal testimony. State v. Kirsch, 363 So.2d 429 (La.1978). The defense was allowed to cross-examine West, at length, about his rebuttal testimony.

Testimony of Bobbie Lewis, Katina Lewis Smith and Chance Lewis:
The state called Bobbie Lewis, Chance Lewis and Katina Lewis Smith to rebut defense testimony from the defendant and Griffin. This defense testimony allegedly *813 differed substantially from Griffin's testimony to the grand jury and from the statements Griffin previously gave to the police. In the prosecution's view, the defendant and Griffin sought to fabricate a way to put the gun into the defendant's hands when he left his home on the night of the shooting with defendant handing the weapon to Myron Smith before the shootings and never getting it back from Smith that night. To that end, the defendant and Griffin both testified that Chance Lewis asked the defendant to walk him home. The defendant got the gun for protection and left with it. At Lewis's home, the defendant handed the gun to Smith and hid from Lewis's mother in the bushes. When he saw Smith begin to shoot, the defendant stated he ran home while Griffin stated that defendant ran toward Smith. The defendant testified that he never touched the gun again that night.
After presentation of this testimony by the defendant and Griffin late Friday evening, the state recalled Officer Rambin on rebuttal and then rested its case. After being instructed by the prosecutor by telephone on Saturday to have her daughter, Yolanda Pickrom, in court on Monday morning, Mary Thornton called Bobbie Lewis to see if she had been contacted as well. During this phone conversation, the defendant, participating via three-way calling from jail, told Bobbie Lewis and Katina Lewis Smith, "I walked Chance home." Both Bobbie Lewis and Katina Lewis Smith testified that this statement meant nothing to them. Bobbie Lewis testified that she would have seen the defendant hiding in the bushes when she came to the carport door on the night of the shooting and that she saw no one hiding there. On rebuttal, Chance Lewis testified that he never asked the defendant to walk him home, that he left the defendant's home alone and walked home alone before the shooting began.
Further, the defendant was allowed to call Officer James Caldwell, a guard at the Caddo Correction Center where the defendant was housed during the trial, during the state's reopened rebuttal. Caldwell testified that he was working on the day that the state alleged that the defendant and his mother made the three-way call to his mother. Caldwell also testified that to his knowledge the defendant did not use the phone on that date and that the phones at Caddo Correctional Center have been "blocked" from allowing three-way calling.
There was no abuse of discretion by the trial court in allowing the state to reopen rebuttal. The rebuttal witnesses contradicted testimony provided in the defendant's case-in-chief by both the defendant and Griffin. Furthermore, the prosecution notified both the court and defense counsel via fax during the intervening weekend that the state intended to make a motion to reopen. The defense had the opportunity to fully cross-examine all of the rebuttal witnesses put on by the state in the reopened rebuttal and was permitted to elicit testimony from a defense witness, Deputy Caldwell. This assignment of error is without merit.

Motion for New Trial:
The denial of a motion for new trial is not subject to appellate review except for error of law. La.C.Cr.P. art. 858; State v. Horne, 28,327 (La.App. 2d Cir.08/21/96), 679 So.2d 953, writ denied, 96-2345 (La.2/21/97), 688 So.2d 521; State v. Davis, 26,682 (La.App. 2d Cir.03/01/95), 651 So.2d 323 writ denied, 95-1093 (La.1/31/97), 687 So.2d 395. The decision on a motion for new trial rests within the sound discretion of the trial judge. Appellate courts will not disturb this ruling on appeal absent a clear showing of abuse. The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. Generally, a motion for new trial will be denied unless injustice has been done. State v. Horne, supra.
After the defendant's conviction, he filed a motion for new trial claiming that the court erred allowing the state to reopen its *814 case for additional rebuttal and that the verdict was contrary to law. Because the court did not abuse its discretion in reopening rebuttal and because the evidence was sufficient to sustain a conviction in this matter, there is no merit in this contention.
Assignment of Error # 6: The trial court erred in denying the defendant's motion to remove two jurors and replace them with alternates.
Two jurors went to lunch during the course of the trial and discussed the testimony of Steven Flakes. Their conversation was overheard by a member of the Caddo Parish District Attorney's Office, who reported the conversation to defense counsel. One of the jurors involved, a lawyer licensed in another state, told the other juror at lunch that he would have objected as hearsay to Flakes' testimony that defendant told him in a phone call, "I think I killed somebody." Also present at lunch with the two jurors were two people who had no role in the trial at all.
After the judge was informed, he separately called each of the jurors into his office, for in-camera interviews about the conversation. He also had telephone interviews with the two other non-juror lunch participants. Following this investigation, the trial court determined that no prejudice occurred and denied the defense's motion to replace the jurors with the two alternates. This type of behavior is not the type of prejudicial misconduct mandating that these two jurors be removed from the panel. While these two jurors did technically talk amongst themselves about the case before deliberations, there was no evidence that this behavior by the members of the jury exposed this jury to outside influences or to evidence not adduced at trial. Further, there was no indication that it tainted the seated jury in any manner. State v. Horne, supra. Accordingly, this assignment of error is without merit.
Assignment of Error # 10: The trial court erred in denying the defendant's motion to reconsider sentence
Defendant filed a motion to reconsider his sentence on June 12, 1998, which asserted his sentence was excessive, but contained no specific grounds upon which the defendant based his claims of excessiveness. La.C.Cr.P. art. 881.1 precludes the defendant from presenting arguments to the court of appeal which were not presented to the trial court. In such a circumstance, the defendant is relegated to having the appellate court consider the bare claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 30,453 (La.App. 2d Cir.2/25/98), 707 So.2d 164. Not only must a motion for reconsideration be timely filed with the trial court, but the motion must also contain a specific ground or grounds upon which the defendant is seeking to have the sentence reconsidered. La. C.Cr.P. art. 881.1(D). State v. Barnes, 607 So.2d 872 (La.App. 2d Cir.1992).
Because this manslaughter conviction was his second felony conviction, the defendant was sentenced to 30 years at hard labor as an habitual offender. The maximum sentence for manslaughter is 40 years. La. R.S. 15:529.1(A)(1)(a) provides that if the second felony is such that upon first conviction the offender would be punished for any term less than his natural life, then the sentence of imprisonment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction. Thus, the minimum sentence that the defendant could have received was 20 years and the maximum sentence was 80 years. The sentence given by the court was not excessive in light of the tragic consequences of this defendant's actions. This assignment of error is without merit.
In sentencing the defendant, the trial court did not award him credit for time served. La.C.Cr.P. art. 880. However, the 1997 amendment to La. C. Cr. P. art. *815 880 makes credit for prior custody self-operating even on a silent record. State v. Ignot, 29,745 (La.App. 2d Cir.09/24/97), 701 So.2d 1001. Thus, this is not error patent.

DECREE
For the foregoing reasons, the conviction and the sentence are hereby AFFIRMED.
NORRIS, J., concurs.
NOTES
[1] In another prosecution arising out of this same incident (Docket No. 31,955-KA), this court affirmed the conviction and life sentence of defendant-appellant, Myron Smith, in an opinion rendered 5/5/99.