775 So.2d 558 (2000)
STATE of Louisiana
v.
Jason T. MATTHIS.
No. 2000-KA-0219.
Court of Appeal of Louisiana, Fourth Circuit.
November 29, 2000.
*559 Harry F. Connick, District Attorney, Jeffrey W. Davidson, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
Martin E. Regan, Jr., Regan & Associates, P.L.C., New Orleans, LA, Counsel for Defendant/Appellant.
(Court composed of Judge WILLIAM H. BYRNES III, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE).
LOVE, Judge.

STATEMENT OF THE CASE:
On March 25, 1999, the defendant was charged by grand jury indictment with second degree murder. La. R.S. 14:30.1. He was arraigned April 1, 1999, and pled not guilty. The defendant waived trial by jury and was found guilty as charged in a bench trial September 22, 1999. He filed a *560 motion for new trial which was denied October 5, 1999. After he waived delays, he was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He filed a motion to reconsider sentence that was denied.

FACTS:
On January 22, 1999 at 3:30 a.m., Royce Campbell was riding his bike to Bally's Casino. On the way there, he discovered Larry Balderas, who was badly injured and lying in the middle of Old Gentilly Road. Thereafter, Royce Campbell called 911.
On the morning of the incident, Holly Smith was working as a bartender at Treasure Isle Tavern on Haynes Boulevard. During her shift, the defendant and Jason Marullo entered the bar and spoke to Charles Melancon. Then, the defendant and Marullo went into the bathroom together. Smith sent Melancon in after them because she thought it was suspicious for two men to go to the bathroom together when there was only one stall. However, after only a few minutes, defendant and Marullo exited the bathroom. After ordering a beer, Smith asked the twenty-year-old defendant for identification, and he produced it. The two men then resumed conversation with Melancon. After noticing blood on both the defendant and Marullo, Smith asked Marullo what had occurred. Marullo responded that he had gotten into a fight at another bar. Smith also noted that she found it odd that both men were wearing the same shirt. In addition, she stated that the clothes produced at the trial were not the ones worn by the defendant the night of the crime.
Melancon said he saw the defendant and Marullo enter the bar and that Marullo said, "We killed somebody." The defendant said, "You better not tell anybody." After following the defendant and Marullo into the bathroom, Melancon saw Marullo take off his shoes and wash the laces. Marullo stated that they had killed an old, white crackhead: "We beat him to death." When Melancon asked how they knew the victim was dead, the defendant said, "I ran over him with my car." Melancon saw blood on the defendant's arm, forehead and his legs from the knee down. In addition, Marullo and the defendant were trying to wash the blood off in the sink.
After exiting the bathroom, Marullo asked Melancon if he wanted to buy cocaine; however, Melancon refused. When Melancon learned the next day that the victim actually had been beaten to death, he reported his knowledge to the police. He also stated that the clothes produced at trial were not those worn by the defendant the night of the crime.
Officer Joel George was the first on the scene of the murder. When he arrived, he saw blood on the ground and on the victim's shirt. He also found a bloody twenty-dollar bill and a Louisiana identification card.
The forensic pathologist, Dr. Alvaro Hunt, stated that the death was caused by a massive hemorrhage on the surface of the brain. He also found many wounds on the victim's face and hands. He could not verify that the defendant had been run over, but said the injuries were consistent with the defendant having been dragged. The victim also sustained broken ribs, which is consistent with having been beaten.
Detective Byron Adams also went to the scene and saw the blood, identification card, and a piece of scalp with hair on it. After learning that the victim had been employed at Tower of Pizza on Downman Road, he went to the restaurant. While he was at the restaurant trying to assess what the victim had been doing in the hours prior to his death, he ran into Melancon.
Detective Adams also went to the bar where the defendant and Marullo had been the night of the crime. He searched the bar and found a bloody shoestring and a bloody cloth towel. After discovering that the victim had died, he obtained an *561 arrest warrant for Marullo, but not the defendant, since he did not know the defendant's full name. After receiving a telephone call from St. Tammany Sheriffs Office deputy, he went to the defendant's home and interviewed him. The defendant was advised of his rights in front of his mother, father and a NOPD officer. Thereafter, the defendant made a statement, which was recorded and later played at the trial.
While at the defendant's home, his parents gave Adams a set of clothing that the defendant said he had been wearing the night of the crime. Officer Adams also confiscated the vehicle from the family's body shop and the clothing worn by the victim. From his investigation, Adams concluded that the struggle had taken place in three locations: the initial spot where there were scuff marks and the money and identification were found, a second area where the body had been "launched", and a third where the victim had dragged himself before being found.
Officer Joseph Tafaro, who is a blood and hair comparison expert, said that there was no blood on the clothing given by the defendant's parents. He found blood on cloth taken from the defendant's vehicle, but tests were inconclusive as to the blood type. Officer Tafaro also found two hairs on the victim's body that were consistent with the defendant's and suggested there was some physical contact between the defendant and the victim.
The defense called Michael Beals, who testified that he grew up with the defendant, and that he knew Marullo through friends. He said that Marullo showed up at a barbecue on the Saturday after the crime and asked him to take him out of town because he had fought with and might have killed a man. Beals said that Marullo told him that he had run over the man with a car, and that the defendant had pulled him back into the car. Furthermore, Marullo told him that he did not want to talk about the incident anymore.
The defendant's brother, Stephen, said that Marullo called him at 2:30 a.m. on the Saturday following the crime, and asked him to take him out of state because he had attacked somebody and run over him with the defendant's car. Marullo told him "Your brother didn't do anything, I just need to get out of here." The brother said Marullo told him that he tried to sell the victim drugs, that he attacked the victim, that the defendant pulled him back into the passenger's seat, and that he climbed over into the driver's seat. Stephen Mathis declined to get involved and told his parents about the incident the next day.
The defense called Michelle Wigginton, the defendant's girlfriend. She said the defendant was very intoxicated when he came to her house early on January 22, 1999. After arriving at her home, he went to sleep in the spare bedroom. Then, he washed his clothes because they smelled of smoke and her parents did not allow smoking in the house. The defendant told her, he met Marullo at Bimini Bay and gave him a ride to New Orleans where they went to a bar. As they were leaving, Marullo talked to a man who got into the car. They drove to a location where the man got out of the car. After which, Marullo got out of the vehicle and started beating the man. The defendant got out, pulled Marullo off of the man, and pushed Marullo into the passenger seat. Marullo jumped into the driver's seat and ran over the man. The defendant then got into the car, and after going to a bar, went home.
Jerry Heirsch, who worked for the Mathis family body shop, said the defendant's father originally bought the car to fix it up. At that time, perhaps a year before the trial, Heirsch repaired the windshield on the car, which appeared to have been in a bad wreck. The windshield was full of blood and hair and there were bloodstains on the inside of the car.
The defendant's father said that the defendant came to him and his wife on Saturday morning at 11:00 a.m. The defendant was in a panic and crying, and the entire *562 family was upset. The following morning, on Sunday at 1:00 a.m., the family received a call from a detective looking for Marullo. At that point, they decided to call the St. Tammany Sheriffs Office and the defendant cooperated with the investigation.
The defendant's father said the first time that he saw the car was when it was brought to the shop where he worked and prepared an estimate for it. He determined the car was "totaled" but later bought it from the owner. He said that at that time, the windshield contained hair and blood.
The defendant's mother said he had told her that he had been with Marullo, and that Marullo had beaten a man. He told her the man had gotten into the car to buy drugs from Marullo, Marullo hit him over the head with a beer bottle, the defendant pulled Marullo off of the man, and Marullo got into the driver's seat and ran over the man. The defendant feared the man was dead. The mother knew that Marullo was facing a sentencing for a stabbing the previous Mardi Gras so when authorities called looking for him, she assumed it was concerning the previous incident. When she asked if that were the case, the detective said that authorities were looking for him concerning a murder in New Orleans East. At that point, she knew the victim was dead, and she told authorities that her son had information concerning the crime. She said the family had cooperated with authorities and that deputies told her the defendant should be charged with being an accessory.
The defense called four character witnesses who testified to the defendant's non-violent nature.

ASSIGNMENT OF ERROR ONE:
Immediately prior to the testimony of Smith and Melancon, the ADA showed them a picture of the defendant. This fact first came to light when the defense was cross-examining Smith. The defense moved for a mistrial on the basis that the defendant had filed discovery motions requesting evidence of any identification procedure, the defendant did not know about the witnesses having seen a picture of the defendant, and the identification procedure was suggestive. The trial court denied the motion on the basis that identification was not at issue in this case: the defense admitted from the very opening statement that the defendant was at the scene and at the bar.
We find that the trial court was correct. The defendant admitted from his first statement all the way through the trial that he was at the scene and at the bar where Smith and Melancon identified him. His girlfriend, the first person he spoke to after the events of the crime, said he told her he had been at the scene and at the bar. Thus, identification was never at issue in this case.
Furthermore, both Smith and Melancon testified that they identified the defendant independent of their having seen the picture of him. The defendant was clearly seated at the defense table when the witnesses testified. There is absolutely no evidence that the viewing of the picture by the witnesses was an "identification."
This assignment is without merit.

ASSIGNMENT OF ERROR TWO:
The defendant argues the evidence was not sufficient to support the conviction. When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and *563 common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. However, La. R.S. 15:438 is not a separate test from Jackson v. Virginia but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
La. R.S. 14:30.1 defines second degree murder as "the killing of a human being ... when the offender has a specific intent to kill or to inflict great bodily harm." Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532.
Here, the defendant argues there was no evidence of his intent to kill the victim and that he was an unknowing and unwilling participant in Marullo's plan. However, the evidence establishes that the defendant drove Marullo and the victim in his own car in the middle of the night to a deserted spot, and even by his own admission, allowed Marullo to beat the victim before he intervened. The victim was savagely beaten, pointing to the fact that even if the defendant did intervene in the beating, he did not do so until Marullo had inflicted great bodily harm. The defendant then, by his own admission, drove the car to a bar, and continued partying while the victim lay struggling for life. Most importantly, the evidence establishes that the defendant went to the bar and began washing up after the crime, evidencing his intent to cover his tracks. He washed his clothes, moved the cleaned car to a body shop, turned over the wrong clothes to authorities, did not even approach authorities for days and then, only did so by his mother making the call. Most importantly, the State presented a witness who said that the defendant was bragging at the bar that he ran over the victim with his car. The trier of fact, a seasoned Criminal District Court judge, found the witness credible. These facts are more than sufficient to support a finding that the defendant intended to kill the victim and that he succeeded in that objective.
This assignment is without merit.

ASSIGNMENT OF ERROR THREE:
After closing arguments, the trial judge announced that he wanted to view the scene specifically because the pictures were not adequate to show the three distinct places where evidence was found and because he wanted to assess the area (presumably to assess its degree of remoteness.) The judge said that he would take Adams with him and that the attorneys were welcome to be present. Defense counsel argued that arguments had ended, that the case was closed, and therefore the judge could not properly view the scene, which would amount to the taking of new evidence. The trial judge ruled that he had the right to re-open the case for a limited purpose. Defense counsel then waived the presence of the defendant, but said he intended "to take a ride out there since I've never seen it myself."
Evidently some logistical problems ensued. The trial judge, the ADA, and Adams waited for defense counsel at the courthouse, searched the building, and could not find him. Defense counsel went to the scene in his own car, but could not locate the exact place. At the scene, the judge waited for twenty minutes for defense counsel to appear. Adams turned a blue light on so that defense counsel could spot them. Defense counsel *564 explained that after he waited near the scene, he spotted a state trooper who called the Seventh District in search of Adams. Eventually, defense counsel contacted Adams through a 911 operator. Adams told defense counsel that everyone had already left the scene, but offered to take defense counsel back there. Counsel declined.
The next morning before the verdict was read, defense counsel objected to the court's having viewed the scene without him present. The trial judge explained that no testimony was taken. The judge said he simply asked Adams to point to the three locations represented in the photographs. The judge stated that he was willing to go back to the scene with all parties, including defense counsel and the defendant. Defense counsel saw "no reason to go back out there."
The defendant argues there was no transcription of the additional evidence taken. The trial court stated no additional evidence was taken.
He argues he was denied his right to counsel because his counsel did not view the scene. The trial judge offered to defer handing down the verdict until counsel could view the scene. Counsel declined.
He argues that the trier of fact should not have considered more evidence after closing arguments had ended the case. La.C.Cr.P. art. 765 provides:
The normal order of the trial shall be as follows:
(1) The selection and swearing of the jury;
(2) The reading of the indictment;
(3) The reading of the defendant's plea on arraignment;
(4) The opening statements of the state and of the defendant;
(5) The presentation of the evidence of the state, and of the defendant, and of the state in rebuttal. The court in its discretion may permit the introduction of additional evidence prior to argument;
(6) The argument of the state, the defendant, and the state in rebuttal;
(7) The court's charge;
(8) The announcement of the verdict or mistrial in jury cases, or of the judgment in nonjury cases; and
(9) The discharge of the jury in jury cases.
When there is more than one defendant, the court shall determine the order of trial as between them.
A defendant may waive his opening statement.
Generally speaking, the court has considerable latitude in determining whether a party to a criminal case is allowed to reopen after resting. La.C.Cr.P. art. 765(5); State v. Bonanno, 373 So.2d 1284 (La. 1979). There is no legal prohibition against the state reopening its case to submit additional evidence as long as it does so before closing arguments. State v. Pickrom, 31,987 (La.App. 2 Cir. 5/5/99), 732 So.2d 800. In Bonanno, the Louisiana Supreme Court found no error in the trial court's allowing the State to "re-open" the case by replaying taped recorded statements during its closing. Although under usual circumstances, discretion to permit the introduction of additional testimony exists only with respect to evidence proffered prior to argument, here there appears to have been no error, even though the order of events was admittedly unusual. The photographs had already been admitted such that viewing the scene the photographs depicted may be seen as cumulative evidence. The trial judge viewing the scene appears to be no different than a jury viewing up close pictures already admitted at the close of evidence. The evidence of where the body and items were found was already in evidence through the photographs. No new testimony was taken. Perhaps more importantly, here, the trier of fact was a seasoned trial judge and the deviation from normal procedure was minor; there was little difference in the trial court stopping the trial to view the scene before argument and viewing the *565 scene after argument and before verdict. Lastly, the trial judge gave defense counsel an opportunity to re-visit the scene with all parties present. Given the trial judge's apparent flexibility, he might have been willing to entertain further argument should it have been necessary, during which the defense could have argued relevant points about the scene. Defense counsel found there was "no reason" to go to the scene, indicating the defense had no further argument to make regarding the details of the scene. The defendant waived his own presence at the scene.
This assignment is without merit.

CONCLUSION
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.