679 So.2d 953 (1996)
STATE of Louisiana, Appellee,
v.
Leon HORNE, Appellant.
No. 28,327-KA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1996.
*955 Lavalle B. Salomon, for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, J. Michael Ruddick, Assistant District Attorney, for Appellee.
Before MARVIN, SEXTON and STEWART, JJ.
STEWART, Judge.
A grand jury indicted Leon Horne on one count of second degree murder. On April 13, 1995, a unanimous jury returned a conviction of one count of second degree murder. The trial court sentenced the defendant to serve life imprisonment without benefit of probation, parole or suspension of sentence on May 31, 1995. On appeal, the defendant urges six assignments of error. As the assignments of error are without merits, we affirm the conviction and sentence.

FACTS
Shortly after seven a.m. on March 16, 1994, Leon Horne sat in his parked Dodge automobile at the Cracker Barrel convenience store on Burg Jones Lane in Monroe. He spoke briefly with an acquaintance, Mr. Eddie Thomas; Mr. Thomas stated that Mr. Horne appeared "unhappy about something." Mr. Horne, employed as a truck driver, had been separated from his wife Patricia for one month before the shooting.
Meanwhile, Mr. James E. Harris, Sr. pulled out of his driveway on Greenfield Drive, a street next to Burg Jones Lane. The defendant lived on Chaney Drive, which runs between Burg Jones and Greenfield. Mr. Harris saw a GMC van turn off Chaney onto Greenfield moving "pretty fast." A brown car cut through a vacant lot, and rammed into the back of the van. Patricia Horne was driving the van. Because of the collision, one of the van's tires blew out, but Mrs. Horne continued northwest on Greenfield. Mr. Horne's car, a brown Dodge, lost its grille and stalled after the impact. Mr. Harris, still driving down Greenfield, ran off the road into a neighbor's yard as Patricia Horne passed him.
The defendant started his car again and sped pass Mr. Harris heading toward Mrs. Horne. The defendant pulled his vehicle up to the passenger's side of the van. He fired two shots from his Ruger P89DC 9mm pistol toward the van while he continued to ram his car into the side of the van. Mrs. Horne accelerated, and attempted a right turn onto Burg Jones Lane. As the vehicle turned, the defendant rammed his car into the passenger side of the van, pinning the van against a guardrail.
The defendant exited the vehicle and jumped onto the hood of the car. He leaned into the passenger's side window of the van and shot his wife eleven times in the back, killing her. Police Officers recovered thirteen spent 9 mm shell casings from the crime scene. Also, found in Mrs. Horne's van was a fully loaded Ruger 9 mm pistol magazine.
After the shooting, the defendant got down off the hood of the car and walked away from the scene at a normal pace south on Burg Jones. Mr. Willie Nettles, Jr., a Greenfield Drive resident, approached the defendant and asked "Can I help you? Do anything?" The defendant answered no, and walked away. He returned to his Chaney Drive home, where his daughter Leslie and her friend Elisha Dawson were preparing to catch the school bus. Miss Dawson stated that Mr. Horne "didn't seem like himself."
Around 7:30 a.m., Ouachita Parish Sheriff's Deputy Glen Springfield arrived at the defendant's home. Deputy Springfield knew the defendant because Horne had been a reserve deputy in the Sheriff's office. After the deputy learned that Mr. Horne was at home and armed, he called the defendant and asked him to come out and talk. Deputy Springfield then called Lieutenant Robert Davis, a friend of Horne's, and asked the lieutenant to come to the defendant's home. Horne told Springfield that he would not *956 hurt either deputy, but refused to leave the house.
Upon Lieutenant Davis' arrival, he and Deputy Springfield went onto the defendant's carport and spoke to him. The defendant appeared nervous and refused to come out stating that he "couldn't go to jail." He continued to repeat this statement to the other officers. Those officers present believed that the defendant might commit suicide. Later that morning the defendant surrendered peacefully. Lieutenant Davis testified that he had known the defendant for more than twenty years, and that the defendant was not acting rationally when they spoke after the shooting. At the trial, the jury rejected the defendant's insanity defense, and found him guilty of second degree murder.
DISCUSSION
Assignment of Error 1. The trial court erred in denying Defendant's Motion for new trial.
Assignment of Error 2. The trial court erred in finding that jury misconduct did not occur.
The defendant challenges the denial of his motion for a new trial, and the trial court's failure to find jury misconduct. He argues that the trial court should have allowed him to examine the petit jury, which would have resulted in the granting of his motion.
The denial of a motion for a new trial is not subject to appellate review except for error of law. La.C.Cr.P. art. 858; State v. Davis, 26,682 (La.App.2d Cir. 3/1/95), 651 So.2d 323, 328. The decision on a motion for new trial rests within the sound discretion of the trial judge. We will not disturb this ruling on appeal absent a clear showing of abuse. The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. Generally, a motion for new trial will be denied unless injustice has been done. La. C.Cr.P. art. 851. State v. Harris, 597 So.2d 163, 164 (La.App.2d Cir.1992).
After the defendant's conviction, Mr. Horne filed a motion for new trial based on allegations of jury misconduct. Specifically, the defendant alleged that contrary to the trial court's instructions, several jurors, including alternate Edna Faye Watts, discussed the case among themselves. Those same jurors had formed an opinion as to the defendant's guilt. The state filed a motion in limine arguing that Ms. Watts' complaint was "based upon bias and prejudice and [does] not rise to a constitutional level." The state requested an opportunity to "explore the disclosed and undisclosed biases and prejudices of the alternate juror."
On May 26, 1995, the trial court held a hearing on the motions. On May 30, 1995, the trial court denied the motion for new trial. The trial court did not transcribe the hearing, but the trial court summarized the relevant points in its reasons for judgment.
Ms. Watts testified that she and two other jurors discussed the case over lunch during the trial. Ms. Watts said that one of these jurors had decided that the defendant was guilty. The juror concluded that the defense psychiatrist was not credible because he had been paid for his testimony. The juror also thought that the defendant was "crazy" because he shot the victim eleven times. The court noted that Ms. Watts complained that the jurors repeatedly commented about the facts of the case before deliberations.
During the hearing, Ms. Watts admitted she had been married to the defendant's cousin, a fact not adduced during voir dire. In a subsequent television interview, she spoke regarding the quality of jurors, and stated that the unanimous verdict was "a rush to justice." These facts led the trial court to question the veracity of her testimony.
Ms. Watts failed to notify the court of the alleged impropriety during the trial. Had she done so, the court could have taken steps to counteract any potential problems. The trial court noted that even if Ms. Watts' testimony was accurate, the defendant failed to prove that the outcome of the trial would have been different without the pre-deliberation discussion among the jurors. The court concluded that "... the evidence of defendant's guilt was great, and his defense of *957 insanity was not viable from the events surrounding the homicide."
Leon Horne challenges each of the trial court's reasons for denying the requested relief. Horne argues that Ms. Watts' participation in the alleged misconduct was not attributable to him, therefore, it should not have weighed against his requested examination of the petit jury. The defendant contends that the alleged pre-deliberation discussion among the jurors, including the alternates, was equivalent to allowing the alternate juror to participate in deliberations resulting in an illegal procedure. State v. Howard, 573 So.2d 481 (La.1991).
The State relies on State v. Stewart, 530 So.2d 1263 (La.App.2d Cir.1988). They assert that the allegedly improper discussions among the jurors were not illegal outside influences. The supposed prejudicial misconduct was not sufficient to warrant a new trial. Therefore, the trial court did not warrant an examination of the petit jury.
In Stewart, supra, the defendant filed a motion for new trial asserting that several jurors, including an alternate, discussed the facts of the case before deliberations. Pursuant to this motion, he sought to examine the jurors. The trial court refused to allow the examination because of the then-in-effect jury shield law, La.R.S. 15:470, which provided:
No juror, grand or petit, is competent to testify to his own or his fellows' misconduct, or to give evidence to explain, qualify or impeach any indictment or any verdict found by the body of which he is or was a member; but every juror, grand or petit, is a competent witness to rebut any attack upon the regularity of the conduct or of the findings of the body of which he is or was a member.
Under limited circumstances, jurors are permitted to testify. As provided in Stewart, supra, at 1268:
An exception to LSA-R.S. 15:470 exists when there is an unauthorized communication or overt act by a third person which creates an extraneous influence upon the jury. State v. Sinegal, 393 So.2d 684 (La. 1981). When the statutory prohibition infringes on defendant's constitutional right to a fair trial, jurors will be deemed competent to testify about the alleged jury misconduct.
Citing State v. Graham, 422 So.2d 123, 134 (La.1982), cert. dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983), this court rejected the defendant's argument, and held that the circumstances of the jurors' discussions were not among those that would permit the jurors to testify. We stated:
The jurors' discussion of the facts among themselves, although in violation of the trial court instruction, did not inject into the proceedings outside influence or extraneous information not developed at trial. The allegations of misconduct prejudicial to the defendant are not supported by the record. The trial court correctly refused to allow the jurors to testify.
Although the Graham issue was different, the defendant complained that an alternate juror expressed his view of the evidence to a principal juror, that reasoning that prejudicial misconduct only occurs when the jury verdict is based on outside information or evidence not developed at trial was correctly applied to the Stewart facts.
The jury shield law has changed. It is now found in La.C.E. art. 606(B), which provides:
LSA C.E. Art. 606, Disqualification of juror as witness
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded *958 from testifying be received for these purposes.
As we stated in State v. Harris, supra:
This article clarifies the previous jury shield law, La.R.S. 15:470, but does not change the requirements for overcoming the prohibition against juror testimony. Therefore, the prior jurisprudence remains applicable. State v. Duncan, 563 So.2d 1269 (La.App. 1st Cir.1990).
The prohibition contained in Articles 606(B), and previously set forth in LSA-R.S. 15:470, is intended to preserve the finality of jury verdicts and the confidentiality of discussions among jurors. State v. Sanders, 539 So.2d 114 (La.App.2d Cir. 1989), writ denied, 546 So.2d 1212 (La. 1989); State v. Morris, 457 So.2d 119 (La. App.2d Cir.1984). Only well pleaded allegations of prejudicial juror misconduct violating a defendant's constitutional rights will require an evidentiary hearing at which jurors shall testify. State v. Graham, 422 So.2d 123 (La.1982); State v. Sanders, supra; State v. Morris, supra. Unless such pleadings are made with particularity, jury members are not competent to testify. State v. Sanders, supra.

The language of La.C.E. art. 606(B) permits a juror to testify regarding: (1) whether any outside influence was improperly brought to the jury's attention.
Therefore, this court concludes the trial court did not abuse its discretion in excluding evidence of alleged misconduct under either this court's interpretations in Stewart, supra and Harris, supra. As this court said in Stewart, communications among jurors, although violating the trial court's instruction, do not amount to "outside influences" or "extraneous" information. The defendant alleges no fact suggesting that the jury based its verdict on prohibited factors such as: coercion by a party, or inadmissible evidence of other crimes obtained from an out-of-court source. This is precisely the Stewart situation and nothing suggests that the result here should be different. Moreover, the defendant has not alleged that the jurors were incompetent due to mental illness, substance abuse or other objectively verifiable conduct. He argues that one or more of the jurors might have improperly influenced other jurors by expressing her opinion at an inappropriate time. The factors that lead a juror to his decision are squarely within the prohibition of La.C.E. 606(B) against juror testimony"a juror may not testify ... to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict ... or concerning his mental processes therewith...."
Because the intra-jury communications, if they took place, were not improper outside influences, extraneous prejudicial information or objectively verifiable misconduct, this court concludes that the trial court properly denied defendant's motion for new trial, and attendant request to examine the jurors. Therefore, the appellant's assignments of error are without merit.
In the fourth, fifth, and sixth assignments of error, respectively, the defendant complains the jury's verdict is contrary to the law and evidence. Defendant argues the jury was incorrect in finding that the defendant was not insane, as the defendant carried his burden of proof by a preponderance of the evidence. Finally, the defendant contends that the testimony at the trial does not support the finding by the jury that the defendant was sane at the time of the homicide.
Mr. Horne initially pled not guilty to the second degree murder charge, but later changed his plea to not guilty and not guilty by reason of insanity. La.C.Cr.P. art. 561. The trial court appointed a sanity commission to examine the defendant's mental condition at the time of the offense. La.C.Cr.P. art. 650. Both members of the commission concluded that the defendant knew the difference between right and wrong at the time of the offense.
In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. La.R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La.C.Cr.P. art. 652; State v. Silman, 95-0154 (La. *959 11/27/95), 663 So.2d 27, 32. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, the defendant must show he suffered a mental disease or mental defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14; State v. Williams, 346 So.2d 181 (La.1977). The determination of sanity is a factual matter. State v. Sepulvado, 26,948 (La.App.2d Cir. 5/10/95), 655 So.2d 623, writ denied, 95-1437 (La. 11/13/95), 662 So.2d 465. All evidence, including expert and lay testimony, besides the defendant's conduct and actions, should be reserved for the fact finder to establish whether the defendant has proven by a preponderance of the evidence that he was insane at the time of the offense. Lay testimony concerning the defendant's actions, both before and after the crime, may give the fact finder a rational basis for rejecting unanimous medical opinion that the defendant was legally insane at the time of the offense. State v. Silman, supra; State v. Peters, 94-0283 (La. 10/17/94), 643 So.2d 1222; State v. Claibon, 395 So.2d 770 (La. 1981).
In reviewing a claim for insufficiency of evidence where an affirmative defense of insanity is raised, this court, must apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. State v. Silman, supra; State v. Peters, supra; State v. Nealy, 450 So.2d 634 (La.1984); State v. Price, 403 So.2d 660 (La.1981); State v. Claibon, supra; State v. Roy, 395 So.2d 664 (La.1981); State v. Foster, 26,143 (La.App.2d Cir. 12/9/94), 647 So.2d 1224, writ denied, 95-0548 (La. 06/30/95), 657 So.2d 1026.
In support of his burden of proving insanity at the time of the offense, the defendant called several family members and one expert witness to testify at trial. Emma Tarver, the defendant's sister, testified that her brother "didn't seem himself" for several days before the murder. During this time, Ms. Tarver testified that the defendant and his wife had separated, and she no longer lived in the Horne's Chaney Drive home. Often the defendant would refuse to allow Ms. Tarver into his home. Ms. Tarver testified that just before the murder she had seen him sit in a dark room and stare at the turned-off television. When she stayed over at the defendant's home, he did not sleep; he passed the night "walking and pacing the floor. Finding stuff to do." The witness said that Mr. Horne's behavior had become so erratic that, before the shooting occurred, she had planned surreptitiously to put Xanax, a prescription drug for anxiety disorders, into his coffee to get him to sleep.
Viola Horne, the defendant's mother, also testified that Mr. Horne was "very, very depressed" in the days before the shooting because his family had broken up. She said that this behavior was unusual. The defendant was not eating or sleeping, and repeatedly complained of headaches and trouble concentrating. She testified that she had given Ms. Tarver the Xanax pill to put in the defendant's coffee. Ms. Horne testified that during the standoff at the defendant's home, he was clinging to a blanket as he paced the floor.
The defendant's mother related a tragic incident from the defendant's childhood. In 1956, the defendant's father shot Ms. Horne in the face. The defendant saw the aftermath of the shooting and learned, some forty-five minutes later, that his father had shot and killed himself. Ms. Horne testified that the defendant's father was very strict with him and expected him to behave like a much older child.
Vernell Horne, the defendant's brother, went into the defendant's house just after the March 16 shooting, and described the defendant's behavior. He stated that the defendant called him "Hobo," the nickname of their dead brother. The witness also said that Leon Horne put the pistol to his temple. Vernell Horne testified that the defendant became very agitated at times, particularly *960 when they discussed the defendant's children.
Robert Glover, a friend of the defendant, testified that he ate breakfast with Mr. Horne almost every day. The witness testified that, for several days before the shooting, Mr. Horne either failed to appear or was "withdrawn."
The defendant's expert witness was psychiatrist Dr. Paul Ware. Dr. Ware testified that the defendant suffered from a major depressive disorder at the time of the crime. During the shooting, the defendant experienced a dissociative disorder that rendered him unable to distinguish right from wrong. Dr. Ware's formal diagnosis was "dissociative disorder not otherwise specified," a specific category of mental illness in the catalog of such diseases, the Diagnostic and Statistical Manual (DSM), versions 3-R and 4. Dr. Ware partially based this diagnosis upon the defendant's stated inability to recall the events surrounding the shooting.
Dr. Ware testified that a dissociative disorder is a mental reaction to an overwhelming or unbearable situation or overwhelming anxiety characterized by a person's loss of contact "with their presence and with their behavior in terms of what they're doing." Dr. Ware stated that a dissociative disorder causes an individual to "develop a mental block and lack of awareness of what they're experiencing, their behavior." The doctor noted that he had never seen a person experience dissociative disorders unless the person had experienced a "significant early childhood trauma that so impacted them that it may have been blocked out of their awareness at the time." Dr. Ware opined that the shooting of the defendant's mother, and his father's subsequent suicide was this type of significant childhood trauma.
The prosecutor raised several points that, to a degree, impeached Dr. Ware's opinion. The doctor admitted that nearly all of the facts upon which he based his opinion were obtained from the defendant or his family. He also said that he had to retest the defendant's personality after the first test revealed that Mr. Horne "was wanting to present himself in the best light he could." Finally, Dr. Ware testified that he had been paid by the defense for his appearance and testimony at trial.
In rebuttal to the defense's expert witness, the state called psychiatrist Dr. George Seiden. Dr. Seiden examined the defendant on one occasion and opined that Mr. Horne suffered from dissociative amnesia, another formal diagnosis from the DSM. Dr. Seiden explained that the dissociation component of dissociative amnesia is characterized by a splitting-off of one function of the mind such as: memory, intelligence, perception, identity from the others. Dr. Seiden said that Mr. Horne's dissociation was combined with selective amnesia, the inability to recall an event after it occurs, and that this combination of processes does not suggest that Mr. Horne was unable to distinguish between right and wrong at the time of the shooting. Although the doctor separately defined the elements of dissociative amnesia, his subsequent explanations of the effect of the condition combine the separate parts into a single theory.
The doctor explained that many people who commit homicide are unable to remember the crime, and that this phenomenon is more common among killers who know their victims. Dr. Seiden also stated that the defendant's psychological tests indicated that Mr. Horne was "likely to respond with feelings of resentment and anger and at times violence ... when he feels slighted.... [H]e's a person who is likely to explode." Both doctors testified that the defendant told them that, just before the car chase and shooting, his wife drove by, looked at him and laughed at him.
Doctor Seiden testified that the personality tests relied upon by Dr. Ware did not distinguish between personality traits and the effects of immediate problems. The tests' suggest that Mr. Horne was troubled, but that could have been the result of his recent incarceration rather than long-term difficulties. Dr. Seiden attached little significance to the suicide of the defendant's father, noting that the defendant himself had not been "troubled ... through the years" by nightmares or persistent recurring thoughts about the event. Dr. Seiden testified that Mr. *961 Horne told him nothing about the shooting of his mother. Furthermore, the doctor was not aware of the defendant's withdrawal from friends and family in the days before the shooting. However, he testified that knowledge of these events would only strengthen his diagnosis, as they are classic symptoms of a person who suffers a "dissociative amnestic episode."
Expert testimony is relevant to the issue of whether a defendant is insane, but even where experts opine that the defendant is insane, the issue is for the jury to decide. State v. Sepulvado, supra; State v. Birdsong, 452 So.2d 1236 (La.App.2d Cir.), writ denied, 457 So.2d 1200 (1984). Dr. Seiden explained that the difference between his diagnosis and Dr. Ware's was small. Reputable psychiatrists often disagree about the legal implications of a particular diagnosis. The doctor said that these disagreements arise because "lots of psychiatrists will testify but not many psychiatrists spend the time to determine the standards that are supposed to be applied." This is hardly a novel view. In State v. Silman, supra, the court quoted the view of a prominent mental health organization on the issue:
While this court declines to speculate whether the DSM is a reliable psychiatric diagnostic tool, we note that the recent addition of the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, xxiii (4th ed.1994) warns against the dangers of DSM-IV criteria being utilized in a forensic setting. According to the APA,
When the DSM-IV categories, criteria, and textual descriptions are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM-IV diagnosis. This might include information about the individual's functional impairments and how these impairments affect the particular abilities in question. It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.
Nonclinical decision makers should also be cautioned that a diagnosis does not carry any necessary implications regarding the causes of the individual's mental disorder or its associated impairments. Inclusion of a disorder in the Classification (as in medicine generally) does not require that there be knowledge about its etiology. Moreover, the fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time.
(emphasis added).
Thus, by the APA's own principles, a person clinically diagnosed with a particular mental disorder does not in itself determine that the person was legally insane at the time the crimes were committed.... [T]he issue before this court is not whether defendant suffered from a particular psychiatric personality disorder, but rather whether the defendant was able to distinguish right from wrong at the time of the offenses.
The evidence, both lay and expert, tends to show that the defendant was suffering from mental and emotional problems at the time of the offense. However, the testimony of the *962 defendant's family and friends is essentially neutral on the ultimate issue, whether Mr. Horne knew the difference between right and wrong at the time of the offense. The unrebutted testimony of defendant's depression, sleeplessness and depressed mood before and just after the shooting establishes components of the diagnoses of both doctors, but does not inform the fact finder of the legal implications of those diagnoses. Although the jury was free to reject the expert testimony, the lay testimony was insufficient to establish the defendant's insanity.
Thus, the jury was confronted with a decision of which expert opinion to credit. A determination of the weight of evidence is a question of fact which rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. See State v. Claibon, supra; State v. Nolan, 503 So.2d 1186 (La. App.3d. Cir.), writ denied, 507 So.2d 226 (La.1987). If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. State v. Mussall, 523 So.2d 1305 (La.1988); Jackson v. Virginia, supra.
Thus this court cannot conclude that the jury's decision to credit the testimony of Dr. Seiden and discount that of Dr. Ware was irrational. Both doctors testified that the defendant most likely suffered a dissociative episode during the shooting. The doctors disagreed about whether such episodes preclude the understanding of right and wrong. Dr. Ware testified (R. Pp. 321-322):
[A] dissociative disorder is the same [as a physical paralysis]. Except that the person doesn't develop a physical symptom. They develop a mental block and lack of awareness of what they're experiencing, their behavior. They're more commonly noticed and associated with severe physical and mental abuse. Where the person (sic) that becomes unbearable and they disassociate. Their mind goes away where they don't have to recall an experience that painful.
Dr. Ware concluded, "I do not believe that he knew he was doing it or was aware that what he was doing was wrong." Dr. Seiden explained the components of dissociative amnesia.
Dissociation is when a part of you splits off from another part of you. So, there are different functions of our minds. Our memory, intelligence, perception of environment, identity, those things. And when one of those splits off from the other, that's called dissociation....
In this case, he has what's called a selective amnesia. And it, what it means is that there are things that he did that he now cannot remember. And, it's an amnesia, what's important this type of amnesia is that it's an amnesia for something after the fact. [W]hat that means is that simply because he cannot recall it, doesn't mean he did not know it at the time that he was doing it. [T]here are a variety of studies that have shown that.
Dr. Seiden's explanation that the defendant could have understood what he was doing at the time, and dissociated only his memory of the event is at least as well supported by scientific explanation as was the contrary opinion of Dr. Ware. Although Dr. Ware saw the defendant on more occasions than Dr. Seiden, and was better acquainted with his family history, these factors are offset by the clarity of Dr. Seiden's explanations and, in part, by the factors used by the state to impeach Dr. Ware.
In conclusion, the lay testimony regarding the defendant's behavior shows that he was depressed and upset about the breakup of his family. However, this testimony was essentially neutral on the issue of Horne's sanity at the time of the offense. Thus, the defendant had to use the lay testimony in combination with that of his expert, Dr. Ware, to establish his insanity. Dr. Ware and the state's expert, Dr. Seiden, both testified that the defendant had mental problems and made nearly the same diagnosis of this problem as it existed at the time of the shooting.
*963 The experts disagreed on the legal implications of their diagnosis. Both of these opinions were well presented and based on the doctors' experience and knowledge. The jury, faced with a choice between the reasoned opinions of two experts, was not clearly wrong to find the defendant sane at the time of the offense.
The remaining assignment of error was neither briefed or argued. It is therefore considered abandoned. URCA, Rule 2-12.4.

DECREE
For the foregoing reasons, the defendant's conviction for second degree murder is affirmed.
AFFIRMED.