# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**19-873**

**STATE OF LOUISIANA**

**VERSUS**

**ELIZABETH TRAHAN**

**A/K/A ELIZEBETH TRAHAN**

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 59524
HONORABLE LAURIE A. HULIN, DISTRICT JUDGE
**\*\*\*\*\*\*\*\*\*\***

**ELIZABETH A. PICKETT**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Elizabeth A. Pickett and Billy H. Ezell, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**SAUNDERS, J., dissents and assigns reasons.**

Chad M. Ikerd
Louisiana Appellate Project
P. O. Box 2125
Lafayette, LA 70502
(337) 336-8994
COUNSEL FOR DEFENDANT-APPELLANT:
       Elizabeth Trahan

**Keith A. Stutes**
**District Attorney, Fifteenth Judicial District**
**John V. Ghio**
**Assistant District Attorney**
**100 N. State St., Suite 215**
**Abbeville, LA 70510**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**PICKETT, Judge.**

## FACTS

The victim, Carl Johnson, was northbound on U.S. Highway 167 in Vermilion Parish on December 15, 2015, when his motorcycle was struck from behind by a Dodge Charger. Mr. Johnson died as a result of injuries he sustained in the crash.

The defendant, Elizabeth Trahan, was charged with vehicular homicide, a violation of La.R.S. 14:32.1; reckless operation of a vehicle, a violation of La.R.S. 14:99; obstruction of justice, a violation of La.R.S. 14:130.1; injuring public records, a violation of La.R.S. 14:132; and failure to notify of her change of address for driver's license purposes, a violation of La.R.S. 32:406. The charges stemmed from the accident in which the victim, Mr. Johnson, died.

At the close of evidence at trial, the trial court granted the defendant's motion for a judgment of acquittal on the charge of obstruction of justice. The jury found the defendant guilty of vehicular homicide on January 16, 2019. The state dismissed the remaining charges. The defendant filed a motion for new trial and/or post-verdict judgment of acquittal and/or in arrest of judgment on April 23, 2019. The trial court denied the motion on August 23, 2019.

The trial court sentenced the defendant to fifteen years at hard labor with all but six years suspended. Those six years are to be served without benefit of parole, probation, or suspension of sentence. The defendant will be placed on active supervised probation with special conditions for three years upon release. The defendant filed a motion to reconsider her sentence on grounds of excessiveness on September 25, 2019. The trial court denied that motion without a hearing on October 1, 2019.

# ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, this court finds two errors patent involving the sentence imposed. The trial court failed to impose a payment plan as to certain fees imposed as conditions of probation and the trial court failed to set a probation supervision fee.

As part of the sentence imposed by the trial court, the defendant was ordered to pay $40.00 to the indigent defender board and $420.50 in court costs. This court has held that if costs or fines are imposed as a condition of probation, the trial court must establish a specific payment plan. *State v. Arisme*, 13-269 (La.App. 3 Cir. 10/9/13), 123 So.3d 1259. Therefore, we remand the case to the trial court with instructions to establish a payment plan for the fees imposed, noting that the plan may either be determined by the trial court or by the Department of Probation and Parole with approval by the trial court.

The trial court failed to impose a supervision fee as a condition of the defendant's probation. The trial court ordered the defendant to "pay a supervision fee to defray the costs of probation," but failed to specify a monthly probation supervision fee. Louisiana Code of Criminal Procedure Article 895(A) provides in pertinent part: "When the court places a defendant on probation, it shall require the defendant to refrain from criminal conduct and to pay a supervision fee to defray the costs of probation supervision . . ." Article 895.1(C) further provides that the supervision fee must be paid monthly and must not be less than $60.00 nor more than $110.00.

This court has stated the following regarding a trial court's failure to set a probation supervision fee:

The defendant's sentence does not necessarily have to be vacated if the trial court decides to set the minimum monthly supervision fee. *See State v. Harris*, 93-1098 (La.1/5/96); 665 So.2d 1164. In *Harris*, the Louisiana Supreme Court remanded the case and gave the trial court the option of amending the court minutes to reflect the change in sentence without bringing the inmate to court. The court stated that the district judge retains the discretion to vacate the sentence originally imposed and to resentence the inmate in open court. *Harris* allowed ministerial corrections of the record in instances where the trial court failed to impose special restrictions required by law. However, the trial court has some discretion in setting the probation supervision fee, as it can impose a fee between twenty and one hundred dollars per month. Therefore, if the trial court opts to assess the minimum fee required by law, it can correct the sentence in accordance with the procedures set forth in *Harris*. However, if the trial court wishes to set a higher fee, the trial court should vacate defendant's sentence and resentence him in open court. Therefore, although we affirm the defendant's conviction, we must remand the case to the trial court with instructions to set a monthly probation supervision fee to be paid in accordance with article 895.1(C).

*State v. Iles*, 96-256, pp. 4-5 (La.App. 3 Cir. 11/6/96), 684 So.2d 38 at 40-41.

In accordance with *Iles*, the present case is remanded for the trial court to impose a specific supervision fee as a condition of the defendant's probation. The trial court should follow the procedure set forth in *Harris* if it imposes the minimum supervision fee. If, however, it chooses to impose a higher fee, the trial court must vacate the sentence imposed and resentence the defendant in open court.

## ASSIGNMENTS OF ERROR

The defendant asserts two assignments of error on appeal:

1. The state failed to prove sufficiently that Elizabeth Trahan was guilty of vehicular homicide. The state failed to prove that she was the operator of the car. Alternatively, even if she was the operator, the state failed to prove how the drugs in her system contributed to the accident in any way.

2. The trial court erred in denying the motion for a new trial. The clerk of court failed to re-issue subpoenas for defense witnesses, while doing so for the state without any need for a subsequent request to subpoena witnesses. A key witness for the defense was never served and did not appear for trial to testify. The clerk's error was not harmless, and the ends of justice required a new trial be granted.

3

## Assignment of Error Number One

The defendant contends the state failed to sufficiently prove she was guilty of vehicular homicide because it did not prove she was the operator of the car. Alternatively, the defendant argues, even if she were the operator, the state failed to prove how drugs in her system contributed to the accident.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268 (citing *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *Lambert*, 720 So.2d at 726-27). Our supreme court has stated:

4

However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown,* 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (first ellipses and third alteration in original).

Vehicular homicide is defined, in pertinent part, as:

the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exist and such condition was a contributing factor to the killing:

(1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.

. . . .

(3) The operator is under the influence of any controlled dangerous substance listed in Schedule I, II, III, IV, or V as set forth in R.S. 40:964.

(4) The operator is under the influence of alcoholic beverages.

. . . .

(7) The operator's blood has any detectable amount of any controlled dangerous substance listed in Schedule I, II, III, or IV as set forth in R.S. 40:964, or a metabolite of such controlled dangerous

5

substance, that has not been medically ordered or prescribed for the individual.

La.R.S. 14:32.1(A).

> The plain text of [La.R.S. 14:32.1(A)] now requires the state to prove four things: 1) the killing of a human being; 2) caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle; 3) a prohibited degree of intoxication; and 4) a link between the intoxication and the killing. Most importantly, the link between the intoxication and the killing does not have to be a "proximate cause," but simply a "contributing factor."
>
> A "proximate cause" is one that directly produces an event and without which the event would not have occurred. See Black's Law Dictionary (10th ed. 2014). By contrast, a "contributing cause" is a factor that - though not the primary cause - plays a part in producing a result. See id. A "factor" is an agent or cause that contributes to a particular result. See id.; see also "Factor," *American Heritage Dictionary* (5th ed. 2019) ("One that actively contributes to an accomplishment, result, or process").

*Leger*, 284 So.3d at 615-16 (footnote omitted). The *Leger* court found the parties stipulated to the defendant's intoxication, "and the pre-collision evidence showed" causation. *Id.* at 618. Thus, the supreme court affirmed the defendant's conviction.

In this case, the defendant and her boyfriend, Victor Guilamo, were traveling north on Highway 167. The central issue at trial was whether she or Mr. Guilamo was the driver of the Dodge Charger at the time of the collision. There is no question that they were both occupants of the vehicle.

Carmelite Miller was traveling north on Highway 167 between Maurice and Abbeville on February 12, 2015, when she witnessed the crash. She was driving in the left lane around seventy miles per hour. She testified a dark Dodge car passed her "going pretty fast." Ms. Miller saw the crash and "saw the motorcycle fly to the left, into the median." The motorcyclist flew into the air and over the car that hit it

6

and landed on the road between that car and Ms. Miller's vehicle. She testified if she had not "slammed on the brakes, [she] would have run over the victim."

Ms. Miller, a first responder and nursing student, got out of her vehicle and provided aid to the victim lying in the road. She testified the defendant came from the driver's side of the car and ran to the victim as Ms. Miller was providing aid. The defendant had blood on her forehead and "was quite upset, very hysterical." Ms. Miller testified she was the first person to reach the victim. She testified the defendant said, "Please don't let him die. I didn't mean to hit him." Other people who had stopped at the scene went to sit with the defendant as Ms. Miller continued to render aid.

Ms. Miller testified that she did not see the defendant get out of the car. She did see the defendant come from the driver's side of the of the car as she ran over to the victim and made the above statement.

Jessica Comeaux was at work at Sam's Country Store at the time of the accident. She testified she heard a motorcycle, saw it turn as if to come into the store's parking lot, and "saw the car just like slam into him." Ms. Comeaux saw a girl in a pink shirt get "out of the front seat of the car." She testified she saw the entire accident through the store window.

On cross-examination, Ms. Comeaux again said she saw the defendant exit the vehicle, and she never saw anyone else leave the car. When questioned about vehicles that possibly impeded her view of the accident, she stated, "I watched the whole—like the thing happen."

Natalie Bienvenue was a registered nurse in the emergency room at Lafayette General Hospital on the day of the accident and treated the defendant. She noticed redness on the defendant's left shoulder but no other injuries, and she

7

did not document any injuries or complaints. Ms. Bienvenue collected a urine specimen from the defendant.

Leah Meade worked as the senior analyst in the toxicology unit of the State Police Crime Lab before her retirement. She performed the analysis of blood and urine specimens of both the defendant and the victim. She found no ethyl alcohol detected in the blood of either, and she found "[n]o drugs of tox significance" in the victim's blood. The defendant's blood, however, contained amphetamine and a major metabolite of tetrahydrocannabinol, otherwise known as THC or marijuana. Her urine sample also contained amphetamine, along with 7-aminoclonazepam, a metabolite of the drug Clonazepam, and a marijuana metabolite. Ms. Meade testified the defendant had detectable amounts of four types of drugs in her system. She could not quantify any of the substances or determine whether the defendant was under the influence of any of them at the time of the accident, but she explained the results showed the defendant had at least the threshold limit of fifteen nanograms per mil of THC. Ms. Meade could not determine when the defendant ingested the THC.

The defendant testified she had smoked marijuana and used amphetamine salts on the morning of the accident, and she admitted those were both illegal drugs. She also testified she had taken Klonopin and Prozac that day. The defendant testified she had a prescription for Klonopine. The defendant did not indicate whether she had a prescription for Prozac.

State Police Master Trooper Craig Alexander was dispatched to Lafayette General Hospital to obtain "some blood from the driver" involved in the crash. He received the specimens from the defendant. Trooper Alexander read the defendant her rights, and she gave him a written statement at the hospital. The defendant said in her statement that she was a passenger in the vehicle. She said she was using

8

Google on her phone, trying to find the address to their destination, Evangeline Downs. The statement said "Vic slammed the brakes." Trooper Alexander thought "Vic could have been the other guy that was in the vehicle with her[,]" but he never saw him. In fact, Mr. Guilamo left the hospital before anyone from law enforcement arrived.

State Police Trooper Kevin Prejean was dispatched to the scene of the accident. He described Highway 167 as a divided roadway connected by a series of crossovers. Upon arrival at the scene, he saw tire marks, skid marks, and debris in the roadway and skid marks and tire marks going into the grass median.

A black Dodge Charger had rear-ended a motorcycle. Neither the motorcyclist nor the driver or any occupants of the car were still at the scene when Trooper Prejean arrived. Trooper Prejean spoke to Ms. Miller, Ms. Comeaux, and another witness, Jennifer Romero, at the scene. They all said they had witnessed the crash. Two of them identified the driver of the car or the person coming from the driver's side as a white female. Ms. Comeaux identified the driver as a white female wearing a pink shirt. Trooper Prejean testified Ms. Romero stated the "motorcycle slowed quickly . . . and the Charger hit it from behind[.]" Ms. Romero did not testify at trial.

The motorcycle seat was embedded in the front grill of the car. Trooper Prejean noted the driver's seat of the car was moved closer to the dashboard than the passenger seat and took measurements of the car's interior to memorialize the position of each seat. The speed limit at the crash site was sixty-five miles per hour.

When Trooper Prejean completed the on-scene portion of his crash investigation, he and his supervisor, Lieutenant Bill Comeaux, went to Lafayette General Hospital and spoke to the defendant, who was wearing a pink shirt. She

9

told Trooper Prejean she and Mr. Guilamo were going to Evangeline Downs, and "she was scanning through some destinations on the GPS and did not see the casino's address on her phone." She stated she was not the driver of the car, which was contrary to what Trooper Prejean had been told at the scene. Trooper Prejean noticed blood on the defendant's forehead and testified her pupils were dilated.

The defendant told Trooper Prejean the other person in the car was not present. He had left the hospital. Trooper Prejean asked the defendant to call him, but she said he had her cell phone. The defendant contacted Mr. Guilamo using a hospital speaker phone, and Trooper Prejean listened to their conversation.

Trooper Prejean heard Mr. Guilamo say he "did not know the location of the crash he was involved in." Mr. Guilamo told the defendant:

> the motorcycle rider went through the windshield of their vehicle. And he told Ms. Trahan he didn't do anything. He was adamant that the [motorcycle] driver did not die. He told Ms. Trahan, "Even if I told the State Police I was the driver, they would not believe me." They began to argue over their personal relationship at that point in time.

The defendant's statement to Trooper Prejean on the night of the accident said she was looking down, and when she looked up, the motorcyclist was almost at a complete stop to turn left. The defendant said she jumped from the passenger's side and ran to assist the motorcyclist after the crash. A white female approached her and told her to sit on the side of the road. The defendant said she retrieved her phone from the passenger side of the car and called her father.

The defendant told Trooper Prejean "she took medication for anxiety, depression, insomnia, and she was anemic." She told him "she had taken Klonopin the night before last . . . . And then she explained to [Trooper Prejean] that she had smoked a bowl of marijuana earlier that morning at 0500 hours, and that she had taken Mr. Guilamo's amphetamine salts that day as well." Trooper Prejean smelled

no alcohol on the defendant's breath. He did note her pupils were dilated in a well-lit room.

Trooper Prejean went to Sammy's Country Store the day after the accident in hopes its surveillance camera had captured video of the crash. Although the video did not show the actual collision, it showed northbound and southbound traffic flow, including the Dodge Charger.

Trooper Prejean's accident report indicated the surveillance video showed a white box truck in the parking lot of Sammy's Country Store that obstructed the camera's view of the northbound lane of the roadway. The video showed the crash occurred at 1:54:05, and a female exited the front door of Sammy's at 1:54:17.[1] The video did not show who exited the driver's side of the vehicle or the defendant running ran back and forth, to and from, the motorcycle driver, and it did not show Mr. Guilamo. The video was neither introduced into evidence nor shown to the jury at trial.[2]

Trooper Prejean was not able to reach Mr. Guilamo until February 17, five days after the accident. Mr. Guilamo was at the Belle Casino in Baton Rouge and said he could not come to Troop I to give a statement because he did not have a car. Trooper Prejean made arrangements to call Mr. Guilamo the next day, but Mr. Guilamo did not answer his phone.

When Trooper Prejean again called the defendant's phone number on February 20, Mr. Guilamo answered. Trooper Prejean went to Mr. Guilamo's residence in Lafayette, and Mr. Guilamo gave him a statement. This was eight

---

[1]Trooper Prejean testified "the actual time of the crash was 14:54, which is 2:54 p.m. . . . it was an hour difference between the video surveillance and the time of the crash."

[2]The defendant made no objection to Trooper Prejean's testimony about the surveillance video or what he testified his report said about it.

days after the accident. Mr. Guilamo said he and the defendant were returning home from a friend's house in Abbeville on the day of the accident. He told Trooper Prejean he was driving the car, and he described the accident to the trooper Prejean. He said Defendant immediately got out of the car to assist the injured motorcyclist.

Trooper Prejean discovered Mr. Guilamo's personal and commercial driver's licenses were suspended at the time of the crash because of an accident in Lafayette in 2014. The licenses had not been reinstated.

No fingerprints or DNA swabbing was done on the steering wheel of the car. Although photographs of the interior of the car showed a red cup on the passenger side, no swabs were taken to determine who may have touched it or drunk from it.

On February 21, Trooper Prejean and Lieutenant Comeaux met with the defendant and Mr. Guilamo at their residence. They all went to Ray Chevrolet where the Dodge Charger was secured. Trooper Prejean videoed the defendant and Mr. Guilamo each sitting in the driver's seat. That video was played for the jury but was not introduced into evidence.[3] The jury had the opportunity to see both individuals sit in the driver's seat and also where the contents of the car were located. At the conclusion of his investigation, Trooper Prejean identified the defendant as the driver of the car.

After Trooper Prejean obtained toxicology results on June 1, he obtained an arrest warrant for the defendant on June 18.

The defendant testified at trial after the trial court established that she understood her rights. She said they were coming from a friend's house going to the casino at Evangeline Downs. She said she was a passenger in the vehicle driven

_____

[3] The defendant's attorney indicated he did not object to Trooper Prejean's testimony about the video of the car.

12

by her boyfriend, Mr. Guilamo. She was trying to find the casino address to enter it into the GPS, but she could not do that when the car was in motion. She testified Mr. Guilamo was driving the car.

The defendant said she remembered a brochure in her purse that showed the casino's address, and she bent forward, "looking on the bottom floor." She testified, "And Vic, my boyfriend, he said, 'Oh, my God.' And when he said that, I looked up and it was too late. The motorcycle was already in front of us." She immediately exited the car and ran to assist the motorcyclist. She "laid down with him and held him and prayed over him and explained – was telling him, 'I'm very sorry, that my boyfriend didn't see you and hit' –[.]" The defendant said she had the victim's blood all over her hands, and some got on her forehead when she brushed her hair out of her face. She testified authorities were told the blood on her forehead "was from an injury, but it wasn't." The defendant disagreed with testimony that said she admitted to being the driver. She testified that she would not have said that because she was not driving. She was "pretty sure [she] stated 'we didn't mean to' [hit the motorcyclist]."

The defendant identified her phone charger, wallet, and cup in a photograph of the floor of the passenger side of the car. She testified that was where she was sitting at the time of the accident. She said she was confused about why her boyfriend had the option of going to the hospital, but she felt she was being forced to go. She said she was not allowed to sign a waiver refusing treatment, but Mr. Guilamo was given that option. He rode to the hospital in the ambulance with her.

At the hospital, Mr. Guilamo "left to go do something with an envelope – put it in their little mail slot in the hospital[.]" He never came back. He took her phone with him. When Trooper Prejean arrived, she tried to call Mr. Guilamo for thirty to forty-five minutes before he finally answered. She said she "asked him

13

every single question that they wanted [her] to ask, but they didn't want [her] to let him know that it was on a speaker and that they were listening." She heard him say the police would not believe him if he said he was driving, but she had "no idea" why he said it. She said she did not know his driver's license was suspended or that he had been involved in a prior accident. The defendant was upset because Mr. Guilamo "wouldn't come back to explain or to do the same thing" she was doing.

The defendant verified she gave statements to Trooper Alexander and Trooper Prejean that night. She admitted taking her medication, smoking pot around 5:00 a.m., and using amphetamine salts she obtained from Mr. Guilamo earlier in the day. She testified she had taken her prescribed Klonopin the day before the crash. The defendant testified she thought she "was normal," not under the influence of any of the drugs, at the time of the crash. She said her prescription medication was for anxiety, depression, and insomnia.

The defendant testified that Mr. Guilamo called his pastor and ex-girlfriend immediately after the accident. She said he offered no help to the motorcyclist lying in the road. He never gave a statement at the scene to let them know he was the driver. The defendant testified Mr. Guilamo "didn't even not once get out to check on [her] or even check on the guy that was laying [sic] limp in the road." She said to the jury, "I wasn't the driver. Please believe me." She testified Guilamo had admitted to several members of her family that he was the driver. None of the people, however, testified in court.

At the time of trial, the defendant and Mr. Guilamo lived together. She testified they were not in a relationship anymore, but they were "co-parenting" their twin boys. Mr. Guilamo was watching the children while the defendant was attending the trial. Mr. Guilamo did not appear to testify at the trial.

*Was the defendant driving the car?*

Ms. Comeaux testified she witnessed the crash through a window from inside Sammy's Country Store, and she saw the defendant exit the vehicle from the driver's side. Trooper Prejean testified it was possible to see the collision while standing inside the store. He acknowledged there were vehicles in the parking lot. Although the testimony established a box truck blocked the view of the surveillance camera, there was no evidence that the truck impeded Ms. Comeaux's view. She unequivocally testified that she saw the accident happen and that she saw a white lady in a pink shirt get out of the driver's side of the Dodge Charger. Ms. Comeaux never denied there were vehicles on the parking lot. She testified her view was unimpeded. The jury obviously believed her testimony.

Ms. Miller also identified the defendant as the driver. However, as a nursing student and first responder, her first priority was providing emergency care to the victim. Although Ms. Miller testified she saw the defendant come from the driver's side of the car, she also testified she never saw anyone actually exit the vehicle. Ms. Miller's testimony that she heard the defendant say, "I didn't mean to hit him" was uncontroverted except by the defendant's testimony that she did not say it. The jury viewed the videotape of both the defendant and Mr. Guilamo sitting in the driver seat of the car. They saw the contents of the vehicle and were aware of the location of the defendant's purse and phone charger. Although the defendant argues the location of the phone charger bolsters her claim she was a passenger, the jury also heard Trooper Prejean's testimony that every time he called the defendant's phone, her boyfriend answered it.

Ms. Bienvenue, the nurse at the hospital emergency room, testified the defendant was uninjured except for redness on her left shoulder, which the state argued was caused by the driver-side seatbelt. The jury was presented with

statements made by Mr. Guilamo to the trooper investigating the accident wherein he stated he was the driver, as well as the fact that he made himself unavailable for eight days. While there was certainly conflicting evidence, when the evidence presented to the jury is viewed in a light most favorable to the prosecution, a rational trier of fact can conclude the defendant was the actual driver of the car. We cannot consider evidence, including statements made by witnesses to Trooper Prejean and included in his report, that were not introduced into evidence. It is impermissible for this court to second guess credibility determinations made by the jury.

### *Were drugs in the defendant's system a "contributing factor"?*

In order to find the defendant guilty of the offense of vehicular homicide, however, the jury was also required to find proof beyond a reasonable doubt that the drugs in her system were a contributing factor to the accident. La.R.S. 14:32.1(A); *State v. Leger*, 17-2084 (La. 6/26/19), 284 So.3d 609. Whether the drugs were a contributing factor is a determination that must be made by the jury after considering all the facts and circumstances surrounding the collision.

This accident occurred at approximately 2:30 p.m. on a day with clear weather and sunshine. At trial, Ms. Miller testified she was driving in the left lane in excess of seventy miles per hour when the Dodge Charger passed her on the right. The Charger then apparently moved back into the left lane because she testified the collision occurred directly in front of her. She said she had to slam on her brakes to avoid being involved. She was, however, able to stop.

Ms. Comeaux testified she heard the motorcycle coming and saw that the motorcycle slowed and turned into the crossover toward the store parking lot when the car slammed into him from behind.

16

Trooper Prejean testified that the statement from Mr. Guilamo indicated the motorcycle came to an abrupt stop in front of him and he could not avoid hitting him. He did not testify at trial, and the jury obviously rejected his claim to be the driver. The collision between the car being driven by the defendant was obviously a violent one since the seat of the motorcycle was embedded in the grill of the Charger. There was no evidence presented that the defendant tried to stop before hitting the motorcycle.

Although the defendant's toxicology report showed the presence of amphetamine, 7-Aminoclonazepam, and a marijuana metabolite in her blood and urine, the levels of these drugs were not established. The defendant admitted she had smoked marijuana around 5:00 a.m. and used amphetamine salts on the day of the accident, which occurred just before 3:00 p.m. She had taken prescription Klonopin the night before the accident and Prozac that morning. Ms. Meade testified the defendant had at least the threshold limit of THC in her system. Trooper Prejean testified the pupils of the defendant's eyes were dilated at the hospital after the accident, an indication she was under the influence of these drugs.

The fact of the presence of these drugs in the defendant's blood and urine does not allow the jury to assume the defendant was impaired or that the presence of those substances was a contributing factor in the accident. The jury can, however, consider the surrounding circumstances, including the reckless manner in which the vehicle was being operated, the speed at which the vehicle was being operated, and the defendant's inability to respond to a vehicle slowing down in her lane. The jury knew the vehicle immediately behind the defendant's vehicle, which was admittedly operating over the speed limit, was able to come to a complete stop to avoid the accident. The jury heard eyewitness testimony as to how the accident occurred. When viewing the evidence under the *Jackson* standard, there is

17

sufficient evidence to support the jury's conclusion that the drugs impaired her ability to respond and was thus a contributing factor in the accident which took Mr. Johnson's life.

*Conclusion*

When viewing the evidence in a light most favorable to the prosecution, we find a reasonable jury could conclude that the defendant was the driver of the Dodge Charger which struck and killed Mr. Johnson, that she was under the influence of controlled dangerous substances listed in Schedule I and II and detectable amounts were found in her blood, and the impairment caused by these drugs was a contributing factor in the accident that caused the victim's death. The defendant's conviction is affirmed.

**Assignment of Error Number Two**

The defendant argues the trial court erred in denying her motion for a new trial. She argues the clerk of court failed to re-issue subpoenas for defense witnesses, and a key witness for the defense was never served and did not appear at trial to testify. The defendant argues the ends of justice requires a new trial be granted.

In *State v. Friday*, 43,157, pp. 7-8 (La.App. 2 Cir. 3/26/08), 979 So.2d 672, 676, *writ denied*, 08-860 (La.11/14/08), 996 So.2d 1088, the second circuit set forth the standard for appellate review of a motion for a new trial:

> The denial of a motion for new trial is not subject to appellate review except for error of law. La. C. Cr. P. art. 858; *State v. Horne*, 28,327 (La.App.2d Cir.8/21/96), 679 So.2d 953, *writ denied*, 96-2345 (La.2/21/97), 688 So.2d 521. The decision on a motion for new trial rests within the sound discretion of the trial court. *State v. Horne*, *supra*. The appellate court will not disturb this ruling on appeal absent a clear showing of abuse. *Id.* Generally, a motion for new trial will be denied unless injustice has been done, no matter on what allegations it is grounded. *State v. Dowden*, 41,939 (La.App.2d

Cir.3/28/07), 954 So.2d 300, *writ denied*, 07-909 (La.11/9/07), 967 So.2d 501; *State v. Horne, supra*.

*See also State v. Hollier*, 09-1084 (La.App. 3 Cir. 4/7/10), 37 So.3d 466, *writ denied*, 10-1037 (La. 12/10/10), 51 So.3d 722.

A hearing was held on the motion for a new trial at which the witness at the heart of the motion and argument, Victor Guilamo, testified that he was the driver of the vehicle that hit and killed Mr. Johnson. The trial court considered the testimony at the hearing and the evidence produced at trial. In well-written Reasons for Ruling, the trial court determined: (1) the evidence is not newly discovered, as both the defendant and her attorney were aware at trial that the witness had not been subpoenaed and failed to request an appropriate remedy, (2) the defendant and Mr. Guilamo actually lived together at the time the trial was being held, (3) he was watching their children while she was at trial, and (4) when asked at trial if she wanted Mr. Guilamo to be present, she replied "No." The trial court concluded the defendant is not entitled to a new trial based on La.Code Crim.P. art. 851(B)(3) or (4).

Upon review, we cannot say the trial court abused its discretion in determining the defendant is not entitled to a new trial. This assignment of error lacks merit.

## CONCLUSION

The defendant's conviction for vehicular homicide is affirmed. The case is remanded for the trial court to establish a specific payment plan and to set a probation supervision fee.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

19

**State v. Elizabeth Trahan**

**Saunders, J., dissents and assigns written reasons.**

I disagree with the majority's finding that the state carried its burden of proof in the matter below.  One of the elements the state must prove is that Defendant was intoxicated.  Another is that the substances ingested by the Defendant were a factor in the victim's death.  Despite these required elements, the state produced no evidence of either.

In cases where intoxication or drug induced impairment are a required element, expert testimony is generally used to establish the amount of a substance the defendant has in his or her system and how that amount would influence the defendant.  This expert testimony is then corroborated by evidence of failed sobriety tests, slurred speech, or other visible signs of intoxication. *See State v. Dock*, 49,784 (La. App. 2 Cir. 6/3/15), 167 So. 3d 1097, 1101; *State v. Kestle*, 2007-1573 (La. 12/2/08), 996 So. 2d 275, 281.

The Louisiana Supreme Court has explained that "[i]n some instances, the state likely would have to introduce expert testimony concerning the probable physiological effects of the intoxicant ingested by the defendant, especially in a case involving a prohibited substance other than alcohol." *State v. Leger*, 2017-2084 (La. 6/26/19), 284 So. 3d 609, 616.  Here, we have the type of case singled out by the Court in *Leger* ("a case involving a prohibited substance other than alcohol").  As such, I feel that the state need have introduced expert testimony on the effects of the substances in Defendant's system.  This was not done.  Rather, the state's expert could only testify that Defendant had detectible amounts of four types of drugs,

including at least a threshold amount of THC. Further, the state's expert testified that she was unable to tell whether Defendant was under the influence of any the substances found in the test nor could she testify with certainty as to when Defendant had ingested the substances. This testimony does not carry the state's burden.

Moreover, Trooper Prejean never testifies that Defendant was impaired. Trooper Prejean did testify that Ms. Trahan's eyes were dilated when he saw her at the hospital. However, he did not testify that this suggested impairment nor did the state attempt to qualify Trooper Prejean as an expert. Finally, the state did not establish that Trooper Prejean had requisite knowledge, training, or experience to give a lay opinion on whether Ms. Trahan was impaired based on his observations. *State v. Friday*, 10-2309 (La.App. 1 Cir. 6/17/11), 73 So. 3d 913, *writ denied*, 11-1456 (La. 4/20/12), 85 So. 3d 1258; *State v. Stewart*, 357 So. 2d 1111 (La.1978).

Furthermore, I find no clear indication in the record that Defendant was driving the vehicle at the time of the accident. Contrarily, I feel the evidence indicates that it is just as likely that Victor Guilamo was the driver as it was Defendant.

First, I would give credence to the statement given to Trooper Prejean by Charlot Davis. Davis, an impartial witness, had a superior point of view of the accident and aftermath given she was in the vehicle directly behind the accident. After the accident, Ms. Davis pulled over in the left lane and would have had a clear view of which side Mr. Guilamo and Defendant exited the vehicle. Ms. Davis stated that she "saw a white female with long hair get out of the passenger side of the Charger" and "a dark male exited the Charger from the driver side." Given her proximity to the accident, Ms. Davis, who did not know either Mr. Guilamo or Defendant, had a clear and unobstructed view.

2

Ms. Davis's statement is corroborated by the passenger in her vehicle, Russell Augustus. His statement given to Trooper Prejean stated, "a dark-skinned man exited the driver side of the Charger and a white female exited the passenger side." Mr. Augustus, like Ms. Davis, had an obstructed view of the accident's aftermath and did not know Mr. Guilamo or Defendant. Given the factors surrounding the state's witnesses, Ms. Davis and Mr. Augustus were the only people, other than the passengers of the vehicle themselves, that had a clear view of which side Defendant exited the vehicle.

Second, Defendant and Mr. Guilamo consistently agreed that it was Guilamo driving at the time of the accident. While Defendant and Mr. Guilamo's involvement in the accident renders them biased, the fact is that their statements are consistent with one another and are supported by those of Ms. Davis and Mr. Augustus.

In sum, the people with the best view, or actual knowledge, of whether Defendant was the driver of the vehicle consistently stated that she exited or rode on the passenger side. The credibility of these statements is supported by photographs of the inside of the vehicle which show several of Defendant's items located on the passenger side.

Finally, the post-accident actions of both Defendant and Mr. Guilamo can easily be construed that Mr. Guilamo was the driver. At the scene, Mr. Guilamo remained near the Charger, refrained from checking on the victim, and proceeded to call an ex-girlfriend and his pastor. Meanwhile, even while visibly distraught, Defendant's actions after the accident were to go check on the victim, call out for help, and pray over him.

Thereafter, Mr. Guilamo and Defendant left the scene of the accident in an ambulance. Once at the hospital, without informing Defendant or anyone else, Mr. Guilamo arranged to be picked up by a friend before investigators could arrive. He then avoided answering calls from Defendant and investigators for between 30 and

3

45 minutes.  To the contrary, Defendant complied with investigators by giving samples for toxicology tests, answering questions, and helping the troopers to contact Mr. Guilamo after he left the hospital.  In my view, Mr. Guilamo's actions after the accident tends to indicate wrongdoing while, in contrast, Defendant's compliance tends to indicate innocence.

Inexplicably, Ms. Davis, Mr. Augustus, and Mr. Guilamo were not called to testify at trial. Their testimonies, including the language quoted from Trooper Prejean's report strongly supports Defendant's testimony, was never heard by the jury.  Given the failure of the jury to be presented with these testimonies, under the standard of review, this issue alone is not enough to reverse the conviction.

However, as I discussed above, I would reverse Defendant's conviction because the state failed to carry its burden to prove that Defendant was impaired at the time of the accident and failed to prove that Defendant's impairment was a contributing factor to the victim death. Accordingly, I respectfully dissent.

JDS